GOLDEN SUN FEEDS, INC., appellee, v. JACK D. CLARK et ux., appellants.

No. 51986.

(Reported in 140 N.W.2d 158)

FEBRUARY 8, 1966.

D. W. Harris, of Bloomfield, for appellants.

Brody, Parker, Roberts, Thoma & Harris, of Des Moines, and Milani & Milani, of Centerville, for appellee.

MOORE, J.—The sole question on this appeal by defendants is whether the trial court erred in finding they failed to prove their counterclaim. The judgment and decree foreclosing plaintiff's chattel mortgage, which secured a promissory note and an account owed by defendants, is not otherwise challenged.

Defendant Jack D. Clark and his wife, at all times pertinent here, operated a feedstore at Mystic. In 1959 he started selling feed supplied and manufactured by Foxbilt Feeds, Incorporated, of Des Moines. After attending Foxbilt sales meetings and gaining further knowledge he became a dealer, distributor and block manager for that company. As a blockman or manager he secured franchise dealers, did resale work behind the dealers and supervised loaned or leased chick programs for which he received some compensation.

At a Foxbilt sales meeting in 1959 Clark became interested in the experimental chick field placing program of Ames In-Cross, an Iowa corporation, which was closely interrelated with Foxbilt. Ames In-Cross was engaged in inbreeding, crossbreeding and selling poultry. It contracted with poultrymen to raise and manage test flocks for the purpose of testing the comparative genetic differences of various flocks. The poultryman was required to house and pen each cross separately and to give each pen equal and uniform feed, care and management and keep accurate and complete mortality and daily production records.

The form contract prepared and used by Ames In-Cross in paragraph 5 obligated the poultryman "To permit any representative of the Company to enter the premises of the Poultryman at any reasonable time for the purpose of inspecting said flock or the records.

"(a) If the producer defaults in supplying records as set

forth above or is unable to continue the test due to conditions beyond his control them a fee of 45 cents per day-old chick delivered shall become due and payable to Ames In-Cross and after receipt of payments birds shall become property of the producer.

"(b) The poultryman agrees to follow a feeding program and to feed a brand of feed recommended by Ames In-Cross. If the Poultryman does not wish to comply with the feed requirement, test chicks will be supplied at a fee of 25 cents per pullet chick."

Under the contract Ames In-Cross furnished the poultryman with day-old chicks and agreed to assist with his raising and management problems. On completion of the test the birds became the property of the poultryman. All eggs produced were his property.

During 1959 and '60 Ames In-Cross required the poultryman to use Foxbilt feeds. No such requirement was made for 1961.

In 1960 and '61 Clark obtained contract forms from Ames In-Cross, called on many poultrymen in his area and promoted several contracts between Ames In-Cross and poultrymen to whom he sold feed during the ten-month testing period. His purpose of course was to sell more chicken feed and profit thereby. After obtaining a poultryman's signature Clark mailed the proposed contract to Ames In-Cross for acceptance. Approval of the Ames In-Cross geneticist, Ervin Lester Williams, and of the company administrative assistant were required before the contract was accepted.

Before the fall of 1961 John Morrell and Company purchased and took control of Foxbilt, Ames In-Cross and Golden Sun Feeds, Incorporated, of Estherville. Herman Jensen, manager of Golden Sun, was also an officer and director of Morrell. Golden Sun took over Foxbilt and the name "Foxbilt Feeds" was discontinued. Immediately after the consolidation Golden Sun feed was not required by Ames In-Cross under its contracts with poultrymen but in the fall of 1961 Jensen was putting on pressure through the parent corporation, Morrell, for such a requirement. He was successful in this regard prior to any action by Ames In-Cross on four poultrymen's contracts for 1962 which

Clark had promoted in October 1961. Clark at that time was selling Triple F Feeds. That company was organized by former personnel from Foxbilt.

In the fall of 1961 Clark obtained a proposed contract with Merritt Pollard of Centerville for 1000 chicks plus 200 overrun, another with Trenton Owens for 4000 chicks plus 800 overrun and also with Walter Gwinn and J. C. Anderson. These four proposed Ames In-Cross contracts were mailed by Clark to that company. They remained on the desk of Williams, the geneticist, for many days without approval or disapproval.

Williams testified much confusion then existed regarding what, if any, feed requirement would be made. Shortly thereafter Mr. McCullam, President of Morrell, directed Ames In-Cross to require feeding of Golden Sun. Williams and the Golden Sun sales manager then called on Clark and offered him a Golden Sun dealership which he rejected.

Following Clark's unsuccessful attempt to withdraw the proposed contracts, Gwinn and Anderson cancelled. Pollard's contract was changed to require Golden Sun feed and he was advised another dealer would sell him feed.. He accepted the change although his contract for 1961 permitted use of feed of his own choice. Owens' proposed contract was not used but later he was furnished the chicks requested under a completely new contract. Golden Sun feed was sold to Pollard and Owens by another dealer who took on the line with the assurance he would have these accounts.

Defendants' original counterclaim asked for $1487.50 for loss of profit from feed for 5000 birds he would have sold to Pollard and Owens. On trial, however, he testified:

"Q. Mr. Clark, in your counterclaim here you are asking for $1487.50. Have you abandoned that now? A. This $1487 was computed to be the profit on the feed for these 5000 birds if I had delivered the feed. I am claiming the $1250 which was my agreement.

"Q. Instead of this? A. Yes.

"Q. You are not trying to claim anything on any profit on your feeds? A. I am claiming this twenty-five cents per bird in lieu of the profit on the feed."

Defendants during trial were permitted to amend their counterclaim and alleged an agreement by Ames In-Cross to pay them the 25 cents referred to in paragraph 5(-b) as damages in the event Clark did not get the poultryman's chicken feed business. Defendants alleged interference with their relationship with Ames In-Cross by officials of Golden Sun caused their loss.

The trial court's findings of fact and conclusions of law include: "Under this record, the allowance of damages to defendant on the basis of 25 cents per chick for the 5000 chicks delivered on the Pollard and Owens contracts would be purely speculative, uncertain and not a proper measure of damages."

Defendants' primary attack is on that finding and the ruling based thereon. They argue the proof is sufficient for allowance of actual damages.

Being a mortgage foreclosure action, this case was tried in equity. Our review is de novo. Rule 334, Rules of Civil Procedure. When considering the credibility of the witnesses we give weight to the fact findings of the trial court but are not bound by them. Citation of authority is unnecessary. See rule 344(f)7, Rules of Civil Procedure.

█ The principle underlying allowance of damages is that of compensation with the ultimate purpose to place the injured party in as favorable a position as though the contract had been performed. King Features Syndicate v. Courrier, 241 Iowa 870, 882, 43 N.W.2d 718, 726, 41 A. L. R.2d 467; Huntsman v. Eldon Miller, Inc., 251 Iowa 478, 481, 482, 101 N.W.2d 531, 533; 22 Am. Jur.2d, Damages, section 12.

Volume 25 C. J. S., Damages, section 43, page 742, states: "On breach of a contract, the party not in default may generally recover the profits which would have resulted to him from performance, provided loss ascertainable with reasonable certainty naturally and proximately results from the breach and the profits claimed are not speculative or conjectural and were within the contemplation of the parties when the contract was made."

█ As a general rule parties may by agreement fix the amount to be paid in event of a breach, where the damages are uncertain in nature and amount and the amount fixed is fair.

Riggs v. Gish, 201 Iowa 148, 155, 205 N.W. 833, 836; Huntsman v. Eldon Miller, Inc., supra; 25 C. J. S., Damages, section 101.

■ Volume 22 Am. Jur.2d, Damages, section 212, page 297, states: "The phrase 'liquidated damages' means a sum stipulated and agreed upon by the parties, at the time of entering into a contract, as being payable as compensation for injuries in the event of a breach. It is settled that parties may stipulate, in advance, the amount to be paid as compensation for loss or injury which may result in the event of a breach, and a stipulated sum which is determined to be liquidated damages rather than a penalty is enforceable."

Clark contends he had an oral agreement with Ames In-Cross that in event he did not get the poultrymen's chicken feed business on contracts sent in by him he would be paid the 25 cents per chick referred to in paragraph 5(b). The burden to prove such an agreement by preponderance of evidence rests on defendants. Citation of authority is unnecessary. See rule 344 (f)5 and 6, Rules of Civil Procedure.

■ Assuming, without deciding, plaintiff's liability to defendants on their counterclaim has been established, we now return to the evidence regarding the claim for liquidated damages.

On cross-examination, regarding his conversation with Williams of Ames In-Cross, Clark testified:

"Q. Did he tell you—are you claiming he told you you would be paid twenty-five cents? A. I don't remember the exact words he told me but he indicated to me that the twenty-five cents was to take care of the dealer in case the people didn't follow the feeding program.

"Q. Did he guarantee you the company would pay you twenty-five cents per bird? A. I didn't ask for a guarantee. I did business with Mr. Williams for some time and I fully accepted anything he told me to be true.

"Q. Then he never did tell you you would get twenty-five cents a bird? A. He indicated that to me.

"Q. Well, he didn't tell you, did he? A. He didn't say, you will get twenty-five cents. He just told me it was to take care of the dealer in case the feed program wasn't followed.

"Q. But he didn't say they would pay you twenty-five cents

for every bird that wasn't fed your feed? A. No, but he told me I would have the feed business on these birds when they were placed under a contract."

On direct examination Williams testified:

"Q. Now, Mr. Williams, I would like to ask you whether you at anytime told the defendant, Jack Clark, that you or any company you were employed by would pay him twenty-five cents per bird under the test flock contract or any agreement in the event Golden Sun or Foxbilt feed wasn't fed? A. I would have to say no specifically to that question. There was some informal agreements involved there.

"Q. Well, neither you nor the company agreed to pay twenty-five cents to Jack Clark in the event the test flocks in this area weren't fed Foxbilt feed? A. Not specifically twenty-five cents or any other specific fee."

Later the trial court examined Williams:

"Q. * * * Now, you haven't been questioned further with reference to what you meant by informal agreements and the court wants to know as near as you are able to state what was said at that time and in the presence of Mr. Clark and Mr. Hammond, if this is who it was, with reference to this so-called informal agreement? A. Well at the time of the meeting I don't think there was anything said about that twenty-five cents at all. If there was I sure have no memory of it.

"Q. Did you use the term in an answer to Mr. Milani's inquiry that there was some informal agreements made? A. Well, actually—we had—it was generally understood if that twenty-five cents was collected it would be used to compensate these people that had gone to the trouble of doing this. That is what— it was understood that that money would be used for that purpose if and when collected from the flock owners.

"Q. Is that what you meant by informal? A. Yes; there was never anything formal about it.

"Q. But you deny there was any conversation with Mr. Clark as to how he would be compensated in these particular cases if he did not become a Golden Sun dealer? A. If there was any mention of it I have no recollection of it. I am pretty sure we didn't say anything at that time about any twenty-five cents."

Other testimony failed to clarify the question of whether an oral agreement for liquidated damages had been made. We have carefully studied the entire record and agree with the trial court's findings and conclusions that defendants failed to prove an agreement for liquidated damages.

■ Defendants' claim for exemplary damages also fails as actual damages must be shown before exemplary damages may be allowed. Stricklen v. Pearson Constr. Co., 185 Iowa 95, 97, 98, 169 N.W. 628, 629; Kinney v. Cady, 232 Iowa 403, 412, 4 N.W. 2d 225, 229; Shannon v. Gaar, 234 Iowa 1360, 1364, 15 N.W.2d 257, 259; Sebastian v. Wood, 246 Iowa 94, 100, 66 N.W.2d 841, 844; Syester v. Banta, 257 Iowa 613, 627, 133 N.W.2d 666, 675.

Our holding is decisive of this appeal.

Affirmed.

All JUSTICES concur.