Herle H. HOLDEN, individually and as a shareholder of Construction Machinery Company, suing in behalf of himself and all shareholders of said corporation and for the benefit of said corporation, Appellee and Cross-Appellant,

v.

CONSTRUCTION MACHINERY COMPANY et al., Appellants and Cross-Appellees.

No. 55059.

Supreme Court of Iowa.

Nov. 15, 1972.

Rehearing Denied Jan. 10, 1973.

James L. Perkins, of Winston, Strawn, Smith & Patterson, Chicago, Ill., and Wirt P. Hoxie of Hoxie & Teske, Waterloo, for appellants, cross-appellees.

Robert C. Tilden and William H. Carmichael, of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, and T. G. Garfield, Ames, for appellee, cross-appellant.

RAWLINGS, Justice.

This is an equity action in five divisions by Herle H. Holden (Herle), owner of 49.976 percent of outstanding stock in Construction Machinery Company (CMC) against his brother Warren A. Holden (Warren), holder of 50.024 percent, and other corporate officers involving management-control of the corporation. CMC is made a nominal defendant.

Division I of Herle's petition asserts a derivative cause, alleging that April 4, 1964, Warren as president and major shareholder, fraudulently induced CMC to sell him 8000 shares (originally 2000, but later twice split two for one) of Chamberlain Manufacturing Corporation (Chamberlain) stock at a price substantially below fair market value. Trial court held for Herle on this issue but denied an award of punitive damages.

Division II is not instantly involved.

Division III alleges a personal cause predicated on an oral agreement with Warren, acting on behalf of CMC, to the effect Herle would have corporate employment equal in duration and compensation, both as to salary and bonuses, with Warren. Remedially Herle seeks specific perform-

ance and equalization of past compensation by requiring CMC to pay him the additional sum equal to that received by Warren. Trial court held for Herle on this issue and in so doing granted him the right to a conditional annual judgment.

Division IV asserts, as an alternative to Division III, the same cause foundationed, however, upon an individually binding shareholder's agreement. Trial court did not adopt this concept.

Division V asserts Warren wrongfully caused Herle to be "frozen" out of the corporation by harassing and demeaning him, depriving him of a fair return on his investment, denying him employment with or a voice in corporate management, and removing him from corporate office. Trial court, finding merit in these allegations, granted injunctive relief but refused to appoint a "fiscal agent" or receiver.

As indicated above trial court held, in large part, adverse to defendants and they appeal. Plaintiff cross-appeals. We affirm on defendants' appeal, but reverse in part, affirm in part, and affirm in part as modified on plaintiff's cross-appeal.

An understanding of the issues involved compels this prefatory general statement of facts, as best determinable from an unavoidably extensive and intricate record:

CMC is a Waterloo-based corporation engaged primarily in the manufacture of tools and equipment for concrete and construction industries. About 1936, L. S. Holden became the sole owner of CMC. He and his first wife, now Mrs. Leona Hansen, had three children, Herle, Warren and a younger daughter, Mrs. Melva Davey. During the years pertinent to this lawsuit and until his death, July 3, 1955, L. S. Holden was married to Carmen Holden. Except for the last few months of his life L. S. Holden ran the business, but gradually accorded Warren more authority in the management area.

During his lifetime L. S. Holden made substantial gifts of CMC stock to his three children. The father also engineered a series of transactions by which Herle and Warren acquired additional stock from other family shareholders. Resultantly, at time of the father's death July 3, 1955, he possessed 544 shares, Herle and Warren each then owning 2028 shares.

Within a few days after L. S. Holden's demise the contents of his will became known. To the extent here relevant it bequeathed 25 percent of his stock in CMC to Herle, 75 percent to Warren.

Herle testified he was extremely disappointed upon learning his father's will gave majority control of CMC to Warren. There followed several months of frequent discussions between the brothers during which Herle vainly explored possible courses which would make him an equal stockholder with Warren. The latter remained firm in his resolution not to relinquish control. The problem was compounded by the fact that Carmen elected to take her statutory dower interest in the estate instead of the share provided under terms of the will. This meant, among other things, if her dower interest was to be monetarily satisfied some method must be employed which would make cash available to the estate for that purpose.

Although no comprehensive agreement between all of the interested parties was ever reduced to writing, it is evident an accord was reached. Melva received $42,510, Warren $26,924.73, and Carmen $56,060.66. Furthermore, 540 shares of CMC stock were passed by the estate to Carmen, which she then transferred to CMC in consideration of its agreement to pay her a total of $93,484.80 in five equal payments. The $26,924.73 check to Warren was apparently an adjustment for the fact that since the will left him with 272 shares more than Herle, an agreement had been reached which retired 540 shares. Consequently, Warren held 2031 shares, Herle 2029 shares.

Herle testified all of this was resolved between himself and Warren during a dis-

cussion early in 1956. That under this agreement (1) Herle consented to the arrangement giving Warren "control" of CMC; (2) Herle promised to keep all of his CMC stock, fulfill his contractual commitments to Carmen and Melva, and remain in CMC's employ; (3) Warren agreed in return that both of them would have employment with CMC of equal duration, and their compensation, salaries and bonuses, would always be the same. Warren denies any discussion regarding duration of employment or equal recompense.

After the father's death Warren became president of CMC and continued as general manager. Herle remained vice-president in charge of manufacturing. From 1955 through 1963 they received equal remuneration. There appears, however, to have been a noticeable deterioration in their relationship during that period of time.

In December 1960, the board of directors had been expanded to include five key employees, along with Warren and Herle. Active monthly meetings followed for a period of time. This regularity was discontinued by Warren not long after the board out-voted him regarding expansion of research and development facilities. Abandonment of the regular board meeting program served to deprive Herle of an appropriate forum in which he could, and often did, take issue with Warren.

In early 1964, CMC engaged Batten & Associates (Batten), a management consultant organization, to effect a survey of CMC's operations. Joe McBride was then working for Batten. The first report of that study (Batten I) was submitted April 22, 1964. Based upon problems there disclosed a second study was suggested and undertaken in mid-1964 primarily to (1) evaluate management personnel by tests and interviews, and (2) propose a plan of organization. Batten II was made available August 27, 1964. One of the major recommendations there advanced was that manufacturing be placed directly under Warren rather than Herle as in the past.

It also suggested Herle retain responsibility only in the areas of purchasing and design engineering. In any event, the organizational formula proposed in Batten II was never followed. Warren shortly announced a plan putting Herle in charge of engineering only, with production, purchasing, industrial engineering, research and development being under Warren's control. The result was a further deterioration of the brothers' relationship.

Near the end of 1964, Warren paid himself a supplemental bonus of $1500 which Herle did not receive. When salaries were fixed for 1965, Warren got a $50 per month increase but Herle's pay remained at the 1964 level.

The latter became aware of the bonus and salary differential sometime after the first of the year 1965, and in March or April contacted Mr. Beecher, a Waterloo attorney, seeking advice concerning violation of his claimed equal compensation agreement, the Chamberlain deal, and other related problems. Beecher realized Herle's very substantial estate was "locked" in the minority interest of a closely held family corporation. A series of meetings followed among Warren, Herle and their respective attorneys. Mr. Beecher asserted Herle's claimed violation of an equal compensation agreement. Counsels' efforts were directed, however, toward possible solution of the larger overall problems. The relationship between Warren and Herle had then seriously deteriorated and they were communicating almost entirely through their attorneys and by memos passed or placed on the other's desk.

In June 1965, Joe McBride was hired as vice-president of operations, a position comparable to that held by Herle prior to Batten II. Herle was replaced as head of engineering and given the title vice-president in charge of corporate development with no management authority. Being no longer involved in operations he was not participating in meetings and discussions relative to CMC's operations, but continued

to report for work regularly and attended those board meetings irregularly held.

In the spring of 1966 Herle was relieved of all duties and advised, to the effect, a Stock Purchase Agreement which existed between him and CMC was being cancelled, as were life insurance policies on Herle's life, owned by CMC. Although then also told his salary was being reduced, this did not actually occur until later. Upon advice of counsel Herle continued to report for work but had nothing to do.

At the annual stockholders' meeting in early 1968, Herle was reelected to the board of directors, but not made an officer. In April 1968, came a letter from Mr. Hoxie, corporation secretary, proposing Herle's early retirement. This was effectuated by board action in late May. Herle was thereby allowed retirement compensation equivalent to half the average of his highest five years pay within the last ten years. That has continued to date. After Herle's forced retirement he was required to vacate his office, and allowed only limited access to restricted corporate records. This action was filed July 25, 1968.

We shall later consider other pertinent facts as they relate respectively to issues before us.

These are the propositions urged by appealing defendants in support of a requested reversal:

(1) Trial court erred in holding plaintiff established the formation and existence of an enforceable oral employment contract with CMC, equal in duration and compensation with Warren.

(2) Herle's conduct was so hostile to CMC as to constitute a breach of the alleged oral contract, thus affording good cause for his discharge.

(3) The evidence affords no basis for holding the individually identified defendants have taken or are threatening action which would deny Herle his rights as a stockholder or director of CMC.

(4) The preponderance of evidence establishes Warren purchased the Chamberlain stock in 1959, not from CMC in 1964, thus breached no duty to CMC.

(5) Herle is estopped to complain regarding the Chamberlain stock transaction and his claim is barred by laches.

(6) Trial court erroneously awarded Herle the fees for his attorneys prior to conclusion and termination of all proceedings, and the amount allowed is excessive.

(7) Trial court wrongfully enjoined CMC from paying more than 75 percent of all defendants' attorneys' fees and expenses.

On cross-appeal Herle asserts trial court erred in:

(1) holding Warren was not liable for exemplary damages by reason of his Chamberlain related fraudulent acts and conduct,

(2) refusing to appoint Herle or some other qualified person as "fiscal agent" to oversee future CMC operations,

(3) granting to Herle inadequate relief regarding expenses and attorneys' fees incurred in his derivative actions on behalf of the corporation,

(4) denying Herle's request for appointment of separate counsel for CMC and Warren in both the trial and appeal of this case,

(5) permitting use of CMC funds to pay 75 percent of the total defense costs.

Under existing circumstances a determination regarding the foregoing propositions can best be declared as each issue is hereafter resolved.

I. Our review is de novo. Although we are not bound by trial court's fact findings they are accorded weight, especially when considering credibility of witnesses. Iowa R.Civ.P. 344(f)(7). See Erwin v. Erwin, 251 Iowa 1344, 1348, 105 N.W.2d 489 (1960). See also Berger v. Amana Socie-

ty, 257 Iowa 956, 967, 135 N.W.2d 618 (1965).

II. First to be considered is defendants' proposition to the effect trial court erroneously found for Herle regarding the Chamberlain stock transaction. More specifically they take issue with the finding that such stock was purchased by Warren in 1959 as an investment on behalf of CMC, being thereafter held by him in constructive trust for the corporation.

The record reveals, while Warren was president of the Waterloo Chamber of Commerce in 1954, a successful Chamberlain stock subscription campaign was undertaken. Warren actively participated in that program. His election as a Chamberlain director followed.

In 1959, 2000 shares of Chamberlain stock, restricted to board members, were issued in Warren's name, but paid for by a $10,000 check from CMC. This transaction was shown on CMC books as a purchase of "Stock in Other Corporations", and so remained until 1964. Warren claims, on April 6 of that year he gave CMC his personal no-interest-note for $10,000. In any event, a journal voucher dated April 30, 1964, was then entered debiting "Secured Loans to Officers" account; crediting "Stock in Other Corporations" account for $10,000, with an explanatory memo reciting "to show transfer of 2000 shares common stock of CC (Chamberlain) to W. A. Holden. Note for $10,000 given CMC by W. A. Holden secured by 6500 shares Chamberlain Stock".

As aforesaid, Division I of Herle's petition alleges the Chamberlain stock was at all times an asset of CMC and the transfer to Warren in 1964 was for less than its fair value, thus a fraud on CMC.

In an attempt to support their opposing position defendants, and more particularly Warren, attempted to show (a) the transaction was first mistakenly entered upon CMC books as "Stock in Other Corporations"; (b) the 1964 paper transaction was merely a correction of an original error; (c) Warren gave CMC his personal note for $10,000 when the stock was purchased in 1959, and then delivered to Mr. Ries, head of CMC accounting department, a memo directing the transaction be recorded to show the $10,000 payment as a loan to Warren, both instruments being since lost; (d) purchase of the Chamberlain stock was at all times his personal investment.

The testimony with regard thereto is so intermittently protracted and involved as to preclude any summarization. We can do no more than observe that defense counsel endeavored to explain Warren's testimonial statements as being, even to them, a belatedly revealed and self-initiated reconstruction of past events effort on Warren's part. It still remains, however, Warren's testimony on the subject at hand, and that of his quasi-corroborative associate, Leonard Ries, is so replete with inconsistent, improbable and paralogistic statements as to be of no evidential weight or value. See 98 C.J.S. Witnesses § 468.

III. But defendants argue Herle is estopped to assert his derivative complaint regarding the Chamberlain transaction, and the claim is barred by laches.

The elements of equitable estoppel are well established. There must be conduct amounting to false representation or concealment, and a party relying thereon must be thereby misled into doing or failing to do something he would not otherwise have done or omitted. A party asserting this defense has the burden to establish all essential elements thereof by clear, convincing and satisfactory proof. Nothing less will suffice. See Holsteen v. Thompson, 169 N.W.2d 554, 558–559 (Iowa 1969); Janssen v. North Iowa Conf. Pen., Inc. of Methodist Church, 166 N.W.2d 901, 906–907 (Iowa 1969); McClintock on Equity, § 31 at 79–80 (2d ed. 1948); 28 Am.Jur.2d, Estoppel and Waiver, §§ 26–29, 33–44; 31 C.J.S. Estoppel §§ 59, 67–77.

Also, despite defendants' claim to the contrary, one must knowingly take a

position with intention it be acted upon, and that there be reliance thereon by another to his prejudice. See Ames Trust and Savings Bank v. Reichardt, 254 Iowa 1272, 1280, 121 N.W.2d 200 (1963); 28 Am.Jur.2d, Estoppel and Waiver, § 78; 30A C.J.S. Equity §§ 118, 128.

The record discloses Herle's examination of the 1960 CMC audit led him to believe the corporation, absent board authorization, had purchased some Chamberlain stock. From the subsequent 1964 audit he assumed Warren had bought it because the amount owing by Warren to CMC went up by the same amount as the account regarding Chamberlain stock went down. But this alone revealed no actionable irregularity. Later events, however, so alerted Herle that in December 1965 or January 1966, he discussed this matter with attorney Beecher. The latter initially saw nothing wrong from an examination of the audits and suggested Herle talk to Warren, the accountants, or Mr. Lynch a Chamberlain officer. Also, at a December 1967 CMC board meeting Warren directed that Herle talk to no one about assets of the company, Herle being at the same time ordered to get out and stay out. Moreover, Herle was unaware of any purported "correcting" 1964 voucher until just prior to the filing of this action.

■ It is to us apparent the factual situation here involved precludes application of estoppel as alleged by defendants. Stated otherwise, they have failed to establish by clear and convincing proof, requistie knowledge on Herle's part, deceptive or fraudulent conduct or representations by him, actual detriment to defendants, or any other essential elements of estoppel.

■ By the same token, we find no merit in defendants' assertion of laches which is purely an equitable doctrine based on public policy and closely related to estoppel. It pertains to delay in asserting or prosecuting a claim to the disadvantage or prejudice of another. See Davenport Osteopathic Hosp. Ass'n v. Hospital Service, 261 Iowa 247, 261–262, 154 N.W.2d 153 (1967); Boehnke v. Roenfanz, 246 Iowa 240, 248, 67 N.W.2d 585 (1954); McClintock on Equity, § 28 at 71 (2d ed. 1948); 28 Am.Jur.2d, Estoppel and Waiver, § 32; 27 Am.Jur.2d, Equity, §§ 152–155; 30A C.J.S. Equity §§ 112–116.

Authorities cited by defendants in support of their position have been examined and found to be either factually distinguishable or inapplicable under the situation presented in the case at hand.

An inspection of the record before us reveals no such unreasonable delay by Herle in asserting this derivative cause nor, for reasons set forth above, is there any such prejudice to defendants shown as will support the asserted laches defense.

■ It further appears defendants here endeavor to invoke estoppel and laches upon the basis of their own concealments, misleading tactics and misrepresentations. This alone defeats their attempt to fasten the consequences of any claimed delay on Herle's shoulders. See Johnston v. State Bank, 195 N.W.2d 126, 130 (Iowa 1972); Howard v. Howe, 61 F.2d 577, 580 (7th Cir. 1932); Pierce v. International Telephone & Telegraph Corp., 147 F.Supp. 934, 938 (D.N.J.1957); Finnern v. Bruner, 167 Neb. 281, 92 N.W.2d 785, 788 (1958); Scottsbluff Nat. Bank v. Blue J Feeds, 156 Neb. 65, 54 N.W.2d 392, 401–402 (1952).

The asserted defenses of estoppel and laches, not having been established, are here inapplicable and stand as no bar to Herle's actions against defendants.

IV. Furthermore, the corporate records disclose, and Herle established by a preponderance of evidence, in support of the instantly considered derivative action, Warren breached his fiduciary duties as a corporate director of CMC. On that matter several well established legal principles come into full play.

"Where it appears a corporate director is dealing on behalf of the corporation

with another corporation of which he is also a director he is required to make a full disclosure and obtain the consent of all concerned. When it appears he has not done so the burden is on him to establish the good faith, honesty and fairness of the transaction. First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co., 8 Cir., 98 F.2d 416, 425; and Des Moines Bank & Trust Co. v. George M. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174 (1952). We said, in Gord v. Iowana Farms Milk Co., 245 Iowa 1, 18, 60 N.W.2d 820, 830 (1953):

" 'This rule and burden should also apply in dealings between directors who are stockholders, especially in a relatively small corporation in which the stock is closely held.'

"Such director is not liable merely for failure to make full disclosure and to obtain consent but because the transaction is not in good faith, honest and fair." Charles v. Epperson & Co., Inc., 258 Iowa 409, 414, 137 N.W.2d 605, 608 (1965).

And in Gord v. Iowana Farms Milk Co., 245 Iowa at 16–17, 60 N.W.2d at 829, this court said:

"And bearing upon the fiduciary relation of corporate directors and officers, we stated in Des Moines Bank & Trust Co. v. Bechtel & Co., 243 Iowa 1007, 1081, 51 N.W.2d 174, 216: 'It is the policy of the courts to put such fiduciaries beyond the reach of temptation and the enticement of illicit profit. These principles are founded on the soundest morality and have received the clearest recognition in all courts.'

"A director is required to act in the utmost good faith and not for his own personal interest. 13 Am.Jur., Corporations, section 997, page 949.

"And in Hoyt v. Hampe, 206 Iowa 206, 220, 214 N.W. 718, 724, 220 N.W. 45, in referring to the fiduciary relationship of corporate directors this court stated: 'That directors sustain a fiduciary relation to stockholders is conceded. The policy of the law is to put fiduciaries beyond the reach of temptation, by making it unprofitable for them to yield to it. To that end an act by the fiduciary in which personal interest and duty conflict is voidable at the mere option of the beneficiary, regardless of good faith or results. The court will not inquire into its profitableness to the trustee or prejudice to the beneficiary. This rule is applicable to the acts of boards of directors [citing cases].' "

Also, because of its pertinency as an overall guiding principle, we quote this from Des Moines Bank & Trust Co. v. Bechtel & Co., 243 Iowa at 1081, 51 N.W.2d at 216:

"As * * * noted, the promoters, officers and directors of a corporation are the agents of and act for it, and indirectly for its stockholders, and they are the trustees or quasi trustees, at least, of the property of the corporation for the company and its stockholders. They occupy a fiduciary relation to the corporation on which relation the stockholders may rely. The corporate entity and the stockholders, in particular, may presume that these trustees will perform their duties with the diligence, honesty and the utmost good faith, inherent and implicit in their functions. They are not required to be ever on their guard and watchful lest those trustees misapply, destroy, embezzle, steal the corporate assets, or defraud them. Corporate directors and officers may under proper circumstances transact business with the corporation including the purchase or sale of property, but it must be done in the strictest good faith and with full disclosure of the facts to, and the consent of, all concerned. And the burden is upon them to establish their good faith, honesty and fairness. Such transactions are scanned by the courts with skepti-

cism and the closest scrutiny, and may be nullified on slight grounds. It is the policy of the courts to put such fiduciaries beyond the reach of temptation and the enticement of illicit profit. These principles are founded on the soundest morality and have received the clearest recognition in all courts. (Authorities cited)."

■ From all this flows the conclusion, officers and directors of a corporate entity, particularly management controlling directors of closely held corporations occupy a fiduciary, or at least a quasi-fiduciary position as to the corporation and its stockholders. They are thus required to at all times act in utmost good faith, and must exercise powers held for the sole benefit of the corporation and its stockholders, never for their personal gain. Equity holds them strictly accountable as trustees. See Pepper v. Litton, 308 U.S. 295, 306–307, 60 S. Ct. 238, 245, 84 L.Ed. 281 (1939); Schildberg Rock Products Co. v. Brooks, 258 Iowa 759, 766–767, 140 N.W.2d 132 (1966); Berger v. Amana Society, 253 Iowa 378, 385, 111 N.W.2d 753 (1961); Gottfried v. Gottfried, 73 N.Y.S.2d 692, 695–696 (N.Y. S.Ct.1947); 13 W. Fletcher, Cyclopedia of the Law of Private Corporations, §§ 5810–5811 (M. Wolfe, rev. ed. 1965); 1 Oleck, Modern Corporation Law, § 202 at 511–514 (1958); Restatement, Restitution, § 197, and comments; 19 Am.Jur.2d, Corporations, § 1272; 19 C.J.S. Corporations § 761; Annot., 50 A.L.R.2d 1146.

■ Therefore, Warren must be held strictly accountable to CMC for the Chamberlain stock or its fair market value, and for all increases, income, proceeds or dividends realized therefrom.

■ V. An examination of the record reveals to us, as it did to trial court, a preponderance of the evidence supports these conclusions: (1) Warren acquired and held the Chamberlain stock in constructive trust for CMC; (2) as of April 3, 1970, he had received these cash dividends from Chamberlain:

$640.00 in July 1967
$640.00 in October 1967
$640.00 in January 1968
$640.00 in April 1968
$800.00 in July 1968
$800.00 in October 1968
$800.00 in January 1969
$800.00 in April 1969
$800.00 in July 1969
$800.00 in October 1969
$800.00 in January 1970

(3) .Warren liquidated his April 6, 1964, note to CMC by payment of $2000 December 15, 1964, $2000 May 11, 1966, $6000 January 2, 1968; (4) since 1959 the 2000 shares of Chamberlain stock have been twice split, two for one, resulting in 8000 total shares.

Upon the aforesaid substantially supported holdings and conclusions, trial court decreed the 8000 shares of Chamberlain stock held in constructive trust by Warren be forthwith transferred to CMC; as of April 3, 1970, Warren had received cash dividends on Chamberlain stock which, with interest at five percent, made a total of $14,363; as of the same date Warren's liquidation of his aforesaid April 6, 1964 note, with five percent interest, totaled $11,517; the amount due CMC from Warren exceeded the refund owing to Warren by CMC and that Warren owes and shall pay the excess of $2,845.50 to CMC. To that must be added any dividends since received by Warren on the Chamberlain stock, to be accordingly determined and assessment made, on remand. (This must, of course, be with interest at five percent per annum. See The Code 1971, Section 535.-3).

Although trial court erroneously referred to the foregoing award as "actual damages", it more appropriately stands as a judgment for restitution. See Gard v. Razanskas, 248 Iowa 1333, 1336, 85 N.W.2d 612 (1957); Franks v. Lockwood, 146 Conn. 273, 150 A.2d 215, 218 (1959); 5

Corbin on Contracts, § 996; Restatement, Restitution, §§ 1, 190; cf. Schildberg Rock Products Co. v. Brooks, 258 Iowa at 770, 140 N.W.2d at 138.

Alternatively trial court held, in event Warren did not still possess the 8000 shares of stock in Chamberlain then, upon satisfactory proof thereof, judgment would be entered for CMC against Warren upon a determination of restitution due by utilization of a $7 per share value. On remand, however, Warren shall be held accountable for all additional stock which may have been derivatively acquired by him as the result of any split of Chamberlain stock subsequent to entry of judgment in trial court from which this appeal is taken.

The foregoing judgment is affirmed as modified.

VI. On cross-appeal Herle contends, however, trial court erred in holding exemplary damages were not allowable against Warren by reason of (1) his intentional acts of fraud in connection with the Chamberlain stock transaction, (2) his malicious attempt to "freeze" Herle out of CMC.

Although defendants, in their reply brief, advance argument on this subject, they cite no supportive authority whatsoever. See Iowa R.Civ.P. 344(a)(4) (Second), (Third) (d).

Ordinarily, actual damage must be established as a condition precedent to an allowance of punitive damages. See Claude v. Weaver Construction Co., 261 Iowa 1225, 1232, 158 N.W.2d 139 (1968); Golden Sun Feeds, Inc. v. Clark, 258 Iowa 678, 685, 140 N.W.2d 158 (1966). See generally Annots., 31 A.L.R.3d 1346; 48 A.L.R.2d 947; 17 A.L.R.2d 527.

■ On the other hand, in a stockholder's derivative action an equity court may, in its discretion, award exemplary damages upon a showing that some legally protected right has been invaded, such as an intentional act of fraud or other wrongful con-

duct. See Charles v. Epperson & Co., Inc., 258 Iowa at 432, 137 N.W.2d at 617–618; Village of Peck v. Denison, 92 Idaho 747, 450 P.2d 310, 314–315 (1969); International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 583–584 (Tex.1963); 22 Am. Jur.2d, Damages, § 241; Annot., 48 A.L. R.2d 947, 955–958; cf. Annot., 14 A.L.R.2d 715.

Turning now to the matter of Warren's alleged fraudulent conduct, trial court was:

" * * * not sufficiently satisfied that an intentionally fraudulent act was committed in transferring the asset in April, 1964, the finding heretofore made being only that the transfer constituted a 'legal fraud' upon CMC. The fact that Warren might well have felt that he was entitled to the advantage of the CC (Chamberlain) stock transaction because his position as a board member made its original acquisition possible adds further to the Court's conclusion that exemplary damages should not be awarded for that act."

We cannot agree.

■ An intentional act of fraud, as the term is here used, does not mean actionable fraud or deceit. See Hall v. Wright, 261 Iowa 758, 766, 156 N.W.2d 661 (1968); Ford v. Barcus, 261 Iowa 616, 622–623, 155 N.W.2d 507 (1968).

On the contrary, an intentional act of fraud in a court of equity includes all acts, omissions and concealments which involve a breach of either legal or equitable duties, trust or confidence, justly reposed, which are injurious to another or by which an undue or unconscionable advantage is taken. In re Estate of Sibert, 220 Iowa 971, 973, 263 N.W. 5 (1935); Dickinson v. Stevenson, 142 Iowa 567, 571, 120 N.W. 324 (1909). See also Detrick v. Aetna Casualty and Surety Co., 261 Iowa 1246, 1256–1257, 158 N.W.2d 99 (1968).

■ For reasons heretofore disclosed, we find Warren's acts and conduct em-

bracing the entire Chamberlain transaction were dedicated to his own personal gain or advantage, to the detriment of CMC. In this regard the record·reveals he, as managing president of the corporation, (1) personally engineered every phase of the Chamberlain deal, (2) appropriated to his own use all dividends issued upon the Chamberlain stock, (3) directed a falsification of corporate records and other documents when exposed by Herle's instant action, (4) aggravated the aforesaid deception by attempted use of a "reconstruction" stratagem which included the giving of his no-interest-note to CMC, absent board authorization, and (5) subsequently endeavored to impress upon the whole transaction a coloration of honesty by liquidating the no-interest-note prior to commencement of the trial of this case.

Also, as previously determined, Warren unquestionably did all in his power to isolate Herle from any rights or privileges pertaining to CMC management, even to the point of removing him from any corporate office, save as a director. This was patently a wrongful if not malicious "freeze-out". See Claude v. Weaver Construction Co., 261 Iowa at 1229–1232, 158 N.W.2d at 143–144; Charles v. Epperson & Co., Inc., 258 Iowa 409, 431–432, 137 N. W.2d 605 (1965); 2 F. O'Neal, Close Corporations, § 8.07 (1971); W. H. Painter, Corporate and Tax Aspects of Closely Held Corporations, § 4.1 at 138–141 (1971); 1959 Duke L.J. 436, 437; 74 Harv. L.Rev. 1630, 1631 (1961); 35 N.C.L.Rev. 271, 275 (1957).

In sum total the foregoing constituted conduct which, as in Charles v. Epperson & Co., Inc., *supra*, compels an assessment of exemplary damages.

We therefore reverse on this issue and direct that on remand trial court shall enter a $10,000 judgment against defendant, Warren A. Holden, in favor of defendant corporation, Construction Machinery Company.

VII. Herle also contends trial court improperly refused to appoint him or someone else as overseeing "fiscal agent" or receiver for CMC.

Any such appointment is addressed to the court's sound legal discretion. See The Code 1971, Sections 491.66, 680.1–680.2; Frazier v. Wood, 214 Iowa 237, 240, 242 N.W. 78 (1932); Parry v. West (Not contained in Iowa Reports), 197 N.W. 297 (1924); 45 Am.Jur., Receivers, § 22; 75 C.J.S. Receivers § 16.

Further discussion will serve no useful purpose. We find no basis upon which to fault trial court for refusing to appoint a "fiscal agent" or receiver. See 2 F. O'Neal, Close Corporations, § 9.27 (1971).

VIII. It still remains, trial court (1) enjoined CMC from lending money to its officers or stockholders except on such terms, including reasonable interest, as its board of directors may establish, (2) restrained defendants, individually and collectively, from taking any action which would have the effect of denying to Herle a reasonable opportunity to exercise his rights as a CMC stockholder and member of the board of directors.

Defendants challenge the grant of any such injunctive relief. In support of this stand they again argue absence of any "freeze-out" tactics. That issue has been heretofore resolved adverse to them.

We believe it self-evident trial court adopted the foregoing injunctive approach upon the sound premise it would be less drastic than appointment of a "fiscal agent" or receiver.

Defendants, more particularly Warren, have borrowed from CMC without board authorization, and squeezed Herle out of any effective corporate management activities. It may therefore be reasonably assumed, practices of like nature would be continued in the future if not enjoined. There is nothing in the record which can be said to indicate otherwise.

In any event, Herle established a sound premise upon which trial court acted within the ambit of its discretion in both areas denoted above. See Iowa R.Civ.P. 320; O. K. Tire and Rubber Co. v. Oswald, 166 N.W.2d 749, 751 (Iowa 1969); Amdor v. Cooney, 241 Iowa 777, 783, 43 N.W.2d 136 (1950); 42 Am.Jur.2d, Injunctions, §§ 72–73; 43 C.J.S. Injunctions §§ 102–103.

Again there is no cause to interfere with the discretion here properly exercised by trial court.

IX. By his petition Herle individually alleges:

"In 1955, defendant Warren A. Holden, acting on behalf of defendant corporation and as controlling stockholder, made an oral agreement with plaintiff which by its terms, gave to plaintiff lifetime employment with defendant corporation. Said oral agreement further provided that the salary, bonuses and other compensation paid to plaintiff would always be equal to that paid to defendant Warren A. Holden."

Defendants, in resisting, first contend the asserted employment agreement was lacking in consideration and not sufficiently specific to permit a measure of damages, therefore invalid, unenforceable and terminable at the will of either party.

Kitchen v. Stockman National Life Insurance Co., 192 N.W.2d 796 (Iowa 1971), involved an employment contract. We there held in pertinent part, 192 N.W.2d 801, extrinsic evidence may be admitted for the limited purpose of interpreting any language or terms of a contract, and promise for promise creates a mutually legal duty, the breach thereof by one giving rise to a cause of action by the other.

More nearly on point is LaFontaine v. Developers & Builders, Inc., 261 Iowa 1177, 156 N.W.2d 651 (1968). There the parties entered into a written installment agreement for the sale and purchase of corporate stock. Plaintiff-purchaser claimed he and defendant-seller simultaneously entered into an oral agreement by which the former was to be employed by the latter for the equivalent of 25 years. As in the instant case, the oral agreement was effected on behalf of defendant corporation by its managing president. Upholding plaintiff-employee's action for breach of contract we said, 261 Iowa at 1182–1183, 156 N.W.2d at 655:

"The parties are entitled to the benefit of that interpretation of their evidence, and of all reasonable inferences most favorable to their case, in an effort to prove the real intent of the parties to an agreement, and if reasonable minds may differ as to the conclusions to be drawn from that evidence, a question of fact exists. 'The existence of a contract, "meeting of the minds," intention to assume an obligation, the understanding, is to be determined not alone from words used, but in the situation, acts, and conduct of the parties, and from their situation and the attending circumstances, and by the inferences which mankind would ordinarily and reasonably draw therefrom.' (Authorities cited)."

This court also aptly stated in LaFontaine, 261 Iowa at 1185–1186, 156 N.W.2d at 657:

"Equity courts will not hesitate to indulge in inferences which will avoid unfair or inequitable results. On this matter we have stated, ' * * * that an agreement will not be construed so as to give one party an unfair, oppressive or inequitable advantage over the other, that unless the terms of the contract clearly require it, an interpretation will not be given which places one party at the mercy of the other, that courts will endeavor to give the contract that interpretation most equitable to the parties, * * *.' Freese v. Town of Alburnett, 255 Iowa 1264, 1268, 1269, 125 N.W.2d 790 (1964), and citations.

"Bearing this rule in mind, after careful analysis of the record, it is our con-

sidered opinion that the agreement sued upon was a partially-integrated contract and that the interpretation given the oral provisions of the agreement by the trial court was correct."

Recently, in Stauter v. Walnut Grove Products, 188 N.W.2d 305 (Iowa 1971), we were called upon to review a damage award for breach of an oral lifetime employment contract. Plaintiff and his associates in business were approached by defendant's representatives with an offer of purchase. Included was a verbal agreement to engage plaintiff's services at an escalating annual salary for as long as he performed efficiently. In affirming, this court said, 188 N.W.2d at 311–312:

"Absent any consideration beyond the employee's promise to perform, a contract for permanent or lifetime employment is construed to be for an indefinite time, terminable at the will of either party. (Authorities cited).

"However, a different situation arises where there is consideration in addition to the promise to perform services. Where the employee furnishes consideration in addition to his services, a contract for permanent or lifetime employment is valid and enforceable and continues to operate as long as the employer remains in business and has work for the employee once the employee performs competently. (Authorities cited).

" \* \* \*

"In the case at bar, the alleged oral employment contract was incidental to the agreement for the sale of plaintiff's property to defendant W. R. Grace & Company. It is obvious this is not a case where the employee simply promises to perform services without additional consideration involved. In Thompson v. Miller, *supra,* [251 Iowa 324, 100 N.W. 2d 410] this court held plaintiff had more involved than a mere promise to perform services; that plaintiff had paid half of advertising and sales cost, and his traveling expenses, and we there held

plaintiff had a capital as well as a labor investment. See Thompson v. Miller, 251 Iowa at 327, 100 N.W.2d at 412.

"In the matter before us, plaintiff gave up a competitive business to defendant, and as a part of the agreement to sell the business and its equipment, an oral agreement to employ plaintiff under the terms indicated in Division I was entered into. Thus the permanent employment contract had additional consideration to make it valid and enforceable, and not terminable at will."

We deem *Stauter, supra,* to be here applicable and controlling. See also F. S. Royster Guano Co. v. Hall, 68 F.2d 533, 535–537 (4th Cir. 1934); Pitcher v. United Oil & Gas Syndicate, 174 La. 66, 139 So. 760, 761 (1932); 1 Corbin on Contracts, § 96; 1A Corbin on Contracts, § 152 at 12; 3A Corbin on Contracts, § 684 at 229; 53 Am.Jur.2d, Master and Servant, § 33; 56 C.J.S. Master and Servant § 8c. But see Eilen v. Tappin's, Inc., 16 N.J.Super. 53, 83 A.2d 817, 818–819 (1951); 15 Drake L.Rev. 61, 68–71 (1966).

As previously disclosed, L. S. Holden's will served to give Warren 75 percent and Herle 25 percent of all CMC stock held by the father at time of his death. Repeated discussions followed between Herle and Warren. The former was bent upon an equalization of stock holdings, the latter being resolutely determined to retain majority control. In other words corporate control was at stake. After several stormy months had passed an agreement was formulated by which Warren was permitted to have two more shares of stock than Herle. At the same time Herle was promised employment with CMC of the same duration and with compensation equal to that enjoyed by Warren. This agreement was amply supported by special consideration, i. e., settlement of the litigious controversy regarding the father's will and stockholding rights in CMC. See Stauter v. Walnut Grove Products, *supra*; Maloney v. E. I. DuPont de Nemours & Co., 122 U.S.App.

D.C. 268, 352 F.2d 936, 938–940 (1965). This means Herle had more involved than a promise for a promise.

◼ Surely defendants cannot successfully contend the agreement between Warren and Herle, sole CMC stockholders, was not made and entered into on behalf of the corporation. Unquestionably, the rising tension between Warren and Herle posed a threat to efficient corporate operations, if not to its very existence. Thus the employment agreement was ultimately, albeit arduously, reached with the common thought that such was beneficial to CMC, a closely held corporation. See 1 F. O'Neal, Close Corporations, § 1.15 (1971); Galler v. Galler, 32 Ill.2d 16, 203 N.E.2d 577, 586–587 (1964); Clark v. Dodge, 269 N.Y. 410, 199 N.E. 641, 642–643 (1936); cf. Stauter v. Walnut Grove Products, 188 N.W.2d at 310; Inn Operations, Inc. v. River Hills Motor Inn Co., 261 Iowa 72, 84–85, 152 N.W.2d 808 (1967).

The record also discloses that from 1956, date of the subject agreement, through 1963, the brothers did receive equal compensation. Under these circumstances it appears all parties here concerned accorded full recognition to the agreement until it was breached in 1964. See LaFontaine v. Developers & Builders, Inc., quoted above.

We therefore conclude the oral contract of employment asserted by Herle (1) finds substantial support in the record, (2) is predicated upon adequate special consideration, (3) was effected for and on behalf of CMC, and (4) is binding upon that corporation.

◼ X. Furthermore, the term or duration of Herle's promised employment was sufficiently specific to permit a measure of damages for any breach thereof. See generally 3A Corbin on Contracts, § 684.

Trial court found Herle entitled to affirmative relief and judgment should be entered in his favor against CMC for the amount of variance in compensation re-

ceived by Herle and Warren from 1964 to date of the decree, with interest. Trial court also found Herle had expressed a willingness to perfrom his part of the contract and a decree for specific performance would be appropriate. But see King Features Synd. v. Courrier, 241 Iowa 870, 873–874, 43 N.W.2d 718 (1950); 5A Corbin on Contracts, § 1204; 49 Am.Jur., Specific Performance, §§ 134–137; 81 C.J.S. Specific Performance § 82.

Noting, however, the deterioration in the brothers' relationship and effect thereof on the corporation, trial court directed that if either party deemed specific performance not in the best interests of CMC then such party should declare an election with the filing of proper notice. April 28, 1970, Herle filed a declaration of intent to resume working for CMC. May 26, 1970, trial court found Warren, not having filed an election as provided, necessitated an alternative remedy. June 24, 1970, the court accordingly ordered that the first of each year, commencing January 1971, and continuing for the life of the employment period, plaintiff be required to file a verified statement of earnings for personal services, including those received from CMC, and that the corporation likewise file verified statements regarding all compensation paid to Warren. If either party disputed the verified statements, request for hearing could be made. Also, in such event, if CMC contended Herle had not exercised reasonable diligence in finding other employment of the same general character it should thereupon file an appropriate pleading, the burden of proof being then on CMC to prove its contention by a preponderance of the evidence. Judgment is to be entered accordingly.

In resisting this decree defendants assert there is no precedent for same. We find that argument nonpersuasive.

"Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will de-

vise a remedy to meet the situation, though no similar relief has been given before." McClintock on Equity, § 29 at 76 (2d ed. 1948). See also State ex rel. Weede v. Bechtel, 239 Iowa 1298, 1313, 31 N.W.2d 853 (1948); Whitaker & Co. v. Sewer Improvement District No. 1, 229 Ark. 697, 318 S.W.2d 831, 835 (1958); Tull v. Turek, 38 Del.Ch. 182, 147 A.2d 658, 664 (1958); Patton v. Nicholas, 154 Tex. 385, 279 S.W.2d 848, 857 (1955); Southwest Virginia Hospitals, Inc. v. Lipps, 193 Va. 191, 68 S.E.2d 82, 94 (1951); 1959 Duke L.J. 436, 441.

█ Furthermore, mere difficulty in ascertaining and measuring damages does not alone constitute a cause for denial of recovery. Benshoof v. Reese, 250 Iowa 868, 874, 97 N.W.2d 297 (1959).

█ We are satisfied trial court equitably tailored the relief accorded to the exigent circumstances peculiar to this case. Thus the general rule enunciated in LaFontaine v. Developers & Builders, Inc., 261 Iowa at 1189, 156 N.W.2d at 659, is not here controlling. See generally 22 Am.Jur.2d, Damages, § 70; 27 Am.Jur.2d, Equity, § 103; 30A C.J.S. Equity § 599.

XI. Countering, defendants take the position all compensatory relief is precluded because Herle's conduct was hostile to CMC's interests and was a breach of the employment agreement, all of which constituted a good cause for his discharge.

Unquestionably a corporate officer, employee or agent is required to obey all reasonable rules, orders and instructions issued by the employer and to at all times act in the best interests of the corporation. Cf. LaFontaine v. Developers & Builders, Inc., 261 Iowa at 1187, 156 N.W.2d at 658; 19 Am.Jur.2d, Corporations, § 1271; 53 Am.Jur.2d, Master and Servant, §§ 97–98.

The record here discloses:

(1) In 1964 Warren breached the employment agreement;

(2) at all times prior to January 1, 1965, Herle efficiently performed all work assigned him at CMC in such manner as to give no cause for his discharge;

(3) to the extent Herle may have precipitated any disagreements or contributed to disunity between himself and Warren prior to January 1, 1965, he was acting reasonably as an officer, director and holder of a 49.98 percent interest in the corporation;

(4) Warren's violation of the equal compensation agreement in 1964 and 1965 invited and provoked any absence of work efficiency by Herle;

(5) regardless of Warren's violation of the employment agreement, Herle continued to report for work and performed acceptably until placed on early retirement and directed to vacate his office in 1968; and

(6) Warren was at all times the dominant personality, his actions were adverse to Herle's and CMC's best interests as is well demonstrated by the "freeze-out" tactics employed by Warren and his co-defendants.

█ The burden was on defendants to prove the alleged justification for Herle's discharge and removal from any corporate position. See LaFontaine v. Developers & Builders, Inc., 261 Iowa at 1187, 156 N.W. 2d at 658. They failed to meet or carry that burden.

Moreover, there was no such conduct on Herle's part which justified his arbitrary removal as a CMC officer or employee.

We hereby affirm (1) trial court's judgment in favor of Herle against CMC in the sum of $86,742.38 as the amount owing for compensation due him from 1964 to April 3, 1970; (2) trial court's *in futuro* judgment with jurisdiction retained to annually determine and adjudicate the compensation owing to Herle by CMC in accord with the employment agreement and applicable standards. See Bertholf v. Fisk, 182 Iowa 1308, 1310–1314, 166 N.W. 713

(1918). See generally 4 Corbin on Contracts, § 958; 22 Am.Jur.2d, Damages, § 70; 53 Am.Jur.2d, Master and Servant, §§ 62–63; cf. Annot., 22 A.L.R.3d 1047.

XII. Defendants further assert trial court erroneously awarded Herle attorneys' fees in connection with his derivative action prior to conclusion of all proceedings, the amount allowed is excessive, and not adequately supported by the record.

On cross-appeal Herle urges allowance of the aforesaid fees and expenses was timely but inadequate.

These interrelated contentions will be thus considered.

 It should be inceptionally understood that where a corporation stands to suffer loss, or some detriment to stockholders' essential rights will be suffered if appropriate action is not taken, and those in authority are at fault, or fail or refuse to act, then a stockholder may proceed on behalf of the corporation or other stockholders. This is commonly referred to as a derivative action. See Goldstein v. Studley, 452 S.W.2d 75, 78 (Mo.1970). See also Graham v. Machine Works, 138 Iowa 456, 461–463, 114 N.W. 619 (1908); Dalva v. Bailey, 153 F.Supp. 548, 550–551 (S.D. N.Y.1957). And where such stockholder's derivative action produces a discernible benefit to the corporation, or effects some protection to the stockholders as a class, monetary or otherwise, or serves to expose and redress a breach of any corporate function or duty, the corporation is liable for all attendant reasonable attorneys' fees and expenses. Explicatively, where a private stockholder pursues a derivative action which corrects or prevents an abuse of any corporate rights, duties, privileges or procedures, which has a corporate therapeutic effect, all reasonable concomitant attorneys' fees and expenses are chargeable to the involved corporate entity. See Berger v. Amana Society, 257 Iowa 956, 965–966, 135 N.W.2d 618 (1965). See also Mills v. Electric Auto-Lite Company, 396

U.S. 375, 392–397, 90 S.Ct. 616, 625–628, 24 L.Ed.2d 593 (1970); Murphy v. North American Light & Power Co., 33 F.Supp. 567, 571 (S.D.N.Y.1940); Richman v. DeVal Aerodynamics, Inc., 40 Del.Ch. 548, 185 A.2d 884, 885–886 (1962); 13 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 1344 at 1218 (N. Wolfe, rev. ed. 1965); Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658, 663 (1956); 60 Cal.L.Rev. 164 (1972); Annot., 39 A.L. R.2d 580, 583–588.

Mindful of the foregoing, we now set forth the substance of trial court's findings, followed by our related conclusions regarding fees and expenses to be allowed in connection with Herle's derivative action or actions.

1. Trial court found the only aspect of this case derivative in nature was the Chamberlain transaction.

For reasons later set forth we disagree. Furthermore, the trial time monetary benefit to CMC by reason of Herle's derivative action challenging the Chamberlain stock deal resulted in a net benefit of approximately $55,000 to CMC.

 2. Trial court found the injunction issue, being nonderivative, was resolved favorably to the corporation.

The court apparently here alludes to a pretrial injunction proceeding not involved in this appeal. On the other hand trial court understandably overlooked the grant of injunctive relief sought by Herle, by which CMC was qualifiedly enjoined from loaning money to defendants, and they were precluded from encroaching upon Herle's rights as a stockholder-director. For reasons heretofore stated this injunctive proceeding was patently derivative in nature.

 3. Trial court found the "freeze-out" issue was so much a part of the employment contract that it inured to Herle's personal benefit.

In light of the foregoing applicable precepts that finding is not entirely correct. True, it entailed no pecuniary benefit to CMC, but as previously disclosed such is instantly of no consequence. We are also satisfied the "freeze-out" went primarily to Herle's role as a stockholder-officer, and only secondarily to his personal rights under the employment contract.

The record as a whole discloses Warren, a bare majority shareholder, was a dominant factor in the corporation. He exercised his assumed authority accordingly and usually in a manner best suited to his individual interests. Furthermore, the broad scope of "freeze-out" tactics employed included the creation of a captive board which means it had little or no power to exercise broad and independent judgment on matters of corporate policy. Closely related thereto is Warren's abandonment of regular board meetings which served, in part at least, to deprive that body of Herle's engineering experience and advice. Additionally, the "freeze-out" must certainly have had an adverse effect on all corporate personnel with an attendant negative reflection upon CMC's general business complexion.

From all this flows the conclusion that the remedial effect of trial court's findings and our holdings regarding the "freeze-out" should inure to CMC's benefit. That in turn means the "freeze-out" phase of this case was basically of a derivative nature. See Dalva v. Bailey, 153 F.Supp. at 551.

4. Trial court held the computation of fees and expenses should be exclusive of time devoted by counsel and others to the preparation and presentation of a claim for same.

In the absence of argument or citation of supportive authority by either plaintiff or defendants, in opposition to or support of this holding, error if any is deemed waived. See Dickinson v. Mailliard, 175 N.W.2d 588, 597 (Iowa 1970).

5. Trial court held a tremendous amount of preparation and trial time was devoted to impeachment of Warren and his associates, which time should be allocated in part to the nonderivative portions of this case.

We cannot from this alone determine the "part" to which trial court refers. An examination of the record leads us to conclude, however, that not more than one-third of the time to which trial court referred was devoted to nonderivative matters.

Upon the basis of the foregoing we now hold plaintiff, Herle H. Holden, is entitled to judgment against defendant corporation, Construction Machinery Company, for an amount equal to two-thirds of all reasonable attorneys' fees and expenses incurred by plaintiff in connection with the trial of this case and appeal here taken.

We affirm trial court in holding reasonable attorneys' fees and expenses incurred by Herle in connection with his derivative action or actions are chargeable to CMC, but modify as to the basis upon which computation was effected and remand for further proceedings.

On remand the instant judgment is to be set aside. Thereupon trial court shall fix and determine the amount to be allowed for reasonable attorneys' fees and expenses incurred by plaintiff as aforesaid, and thereupon enter appropriate judgment, all in accord herewith. See generally State ex rel. Weede v. Bechtel, 244 Iowa 785, 833–838, 56 N.W.2d 173 (1952); Ontjes v. MacNider, 234 Iowa 208, 12 N.W.2d 284 (1943); Annot., 56 A.L.R.2d 13.

Under these circumstances the question posed by defendants as to timeliness of trial court's prior adjudication regarding legal fees and expenses becomes moot.

XIII. On cross-appeal Herle asserts, trial court erred in permitting use of cor-

porate funds to pay 75 percent of the total defense expenses.

In support thereof Herle argues he, in effect, is being unjustly required to pay 37½ percent of expenses incurred (1) in resisting his action for benefit of the corporation, and (2) for defense of conduct by those who have breached their fiduciary duties and wrongfully exercised their corporate authority.

This court said in State ex rel. Weede v. Bechtel, 244 Iowa at 835, 56 N.W.2d at 200: "A stockholders' derivative action is one in which the corporation should take a strictly neutral part. (Authority cited). The corporation should not use its funds in behalf of those who have despoiled it." Cf. The Code 1971, Section 496A.4(19).

The principles enunciated in *Weede, supra*, are here applicable as to the Chamberlain transaction, breach of fiduciary duties, the "freeze-out", and need for injunctive remedy, all previously discussed.

Other phases of the case not involved in this appeal do not, however, come within the perimeter of *Weede's* preclusionary precepts. We believe a line of demarcation can and should be here drawn.

A reiteration of the factual situation is unnecessary. Upon an examination of the whole record we find the individual defendants are entitled to be indemnified by defendant Construction Machinery Company, a corporation, in an amount equal to 25 percent of the total of all reasonable attorneys' fees and expenses incurred by said defendants in connection with the trial of this case and appeal here taken.

We affirm trial court in holding the individual defendants are entitled to indemnification from CMC for reasonable attorneys' fees and expenses incurred in defense of Herle's nonderivative action, but modify as to the basis upon which

computation was effected, and remand for further proceedings.

On remand the instant judgment shall be set aside. Thereupon trial court shall fix and determine the amount of indemnification to be allowed these individual defendants for reasonable attorneys' fees and expenses incurred by them as aforesaid, and thereupon enter appropriate judgment, all in accord herewith.

XIV. Herle also here urges his pretrial motion for appointment of separate counsel to represent defendant corporation was erroneously overruled.

Viewing the situation in retrospect we are inclined to believe such an appointment would have obviated some of the problems instantly presented.

CMC is unquestionably a nominal or passive, though real, party defendant and as such it was required to adopt a neutral position with regard to this litigation. See generally State ex rel. Weede v. Bechtel, 244 Iowa at 835, 56 N.W.2d at 200; Kelley v. 74 & 76 West Tremont Avenue Corp., 24 Misc.2d 370, 198 N.Y.S.2d 721, 725–726 (1960).

Here, however, we find neither reversible abuse of discretion by trial court nor actual prejudice to Herle.

XV. Costs attendant upon this appeal are taxed one-fourth to plaintiff, three fourths to the individual defendants. See Iowa Supreme Court Rule 23. In taxing such costs defendants shall be limited to $1.50 per printed page of the record, briefs and arguments. See Iowa R.Civ.P. 345.

This case is (1) affirmed on defendants' appeal, (2) reversed in part, affirmed in part, affirmed in part as modified on plaintiff's cross-appeal, and remanded with instructions.

All Justices concur, except REES, J., who takes no part.