P. L. BENSHOOF, appellant, v. W. G. REESE, appellee.

No. 49684

(Reported in 97 N.W.2d 297)

870

■ 

■ 

■ 

JUNE 9, 1959.

Guthrie & Blackburn, of Webster City, and Cudahy, Wilcox & Harris, of Jefferson, for appellant.

Eugene R. Melson, of Jefferson, for appellee.

GARRETT, J.—On March 4, 1958, P. L. Benshoof, plaintiff-appellant, filed his petition alleging he was the owner and operator of Treasure Acres, a livestock farm near Webster City; that on January 20, 1958, the defendant made and delivered to

plaintiff's agent, the Farmers National Bank, his check for three thousand fifty-seven and no/100 dollars, drawn on the Dana office of the Jefferson State Bank and payable to the order of Treasure Acres; that said check was executed in Hamilton County, was duly endorsed by plaintiff's agent and presented to the drawee bank for payment on or about January 23, 1958, and that the bank returned the check unpaid, payment having been stopped by the defendant, W. G. Reese. Plaintiff prayed for judgment for the amount of said check with interest and costs.

The defendant filed his answer and cross-petition (counterclaim) admitting the making, delivery and stopping of said check and in defense alleged the check was given for a boar and eight sows and gilts which were not as warranted, and a $22 hog feeder, and that because of the failure of the consideration, payment of the check was stopped, and an offer was made to rescind the sale and return the hogs upon payment of certain expenses and damages. In his cross-petition or counterclaim defendant alleged the hogs were advertised and warranted to be pedigreed breeding stock satisfactory for breeding purposes, "free of all disease and in good health"; that contrary to said warranty the boar had arthritis at the time of sale and was unfit for breeding purposes and that "at least two of the sows were infected with rhinitis and were not free from disease and were unfit for breeding purposes." He further alleged he expended approximately $8500 making substantial improvements on his farm in preparation for acquiring said hogs; that, because of the disease brought upon the farm by the hogs purchased, he cannot use said improvements during 1958; that he will be required to dispose of all hogs on the place and that he incurred veterinary and feed bills because of the condition of the hogs purchased. He alleged plaintiff is an experienced breeder of hogs; that appellee purchased the above described hogs from him for breeding purposes; that plaintiff knew he was buying the hogs for such purpose and warranted them to be suitable therefor.

On the trial plaintiff offered in evidence the check and attached paper showing it was protested for nonpayment and rested.

Appellee testified that for a number of years he had raised hogs for market and breeding purposes and then decided to go into the purebred hog business; that he had never before had experience with rhinitis in hogs, and that during the last five years he had averaged raising better than 50 sows a year. He said he inspected the hogs before the sale at public auction but could not examine them closely under the circumstances. Regarding his discovery of rhinitis, he said, "A. Well, I noticed blood around the feed yard, around the lots, and I didn't know where it was coming from, so one morning I went out to finish up chores and this number 46 sow, Kaster Rose, was bleeding like you had stuck her with a knife, * * *." After discovering the rhinitis, he talked with Mr. Wm. D. Guthrie, attorney for appellant, and offered to return the hogs to plaintiff. "Q. Did any other veterinarian examine these hogs at or about that time? A. The state man from Carroll, Dr. Guy Jones examined them. The veterinary from Jefferson examined them. * * * A. They all agreed."

On cross-examination Reese testified three sows were taken to Iowa State College at Ames where they were posted for the purpose of verifying the veterinarians' diagnosis of their disease. Several veterinarians testified for each side regarding the nature and effect of atrophic rhinitis. Dr. Guy Jones said, "A. It is considered contagious by all the authorities that I have read." Dr. A. C. Strafuss, veterinarian employed by Iowa State College in the diagnostic laboratory, testified he examined the heads of the three sows and found severe atrophy of the nasal turbinates, in one instance causing the nose to turn to the right. There was evidence the boar was affected with polyarthritis to the extent that his value as a breeding animal was greatly diminished. There was testimony Reese made an offer to Mr. Guthrie, plaintiff's attorney, to return the hogs and rescind the contract, and that his offer was refused.

At the close of the evidence plaintiff's motion for a directed verdict was overruled. The jury returned a verdict for the plaintiff for $22, the admitted value of the hog feeder, and for defendant on his counterclaim for $4115. Plaintiff's motion for a new trial was overruled and on September 26, 1958, judgment was entered on the verdict. Plaintiff has appealed.

I. While a different order might be more logical, we shall consider the errors relied upon for reversal in the order chosen by appellant. Eighteen claimed errors are listed in eight divisions. Division I asserts the trial court erred in ruling that the damages claimed by appellee in his cross-petition were not too remote; in receiving certain testimony as to damages over objection that it was outside the issues, remote, speculative and not the proper measure of damages, and in giving Instruction No. 21 which stated an erroneous measure of recovery. Instruction No. 21 is as follows:

"If you find a verdict for the defendant Reese against the plaintiff Benshoof upon the counterclaim, you will determine the amount of the same as follows:

"You will determine and allow what is shown by the evidence to have been the reasonable value of the things furnished and the amount of the expenses reasonably and properly incurred by Reese in caring for and preserving the property concerned while the same was being held by him, not exceeding, on this account $515.

"You will determine whether the evidence establishes that Reese lost the use of his farm buildings and improvements for the raising of other hogs in the year 1958, because of keeping and holding the hogs which Benshoof sold him. If you determine that Reese did suffer such a loss for that reason, then you will determine what the evidence establishes is the value of the use of the buildings and improvements of Reese for the raising of hogs in 1958, and you will allow him recovery for it, but not exceeding on this account the sum of $1200.

"You will determine whether the evidence establishes that Reese lost earnings or profits in the raising of other hogs for the year 1958, because of his keeping and holding the hogs sold to him by Benshoof. If you determine that Reese did suffer such a loss, you will allow him on this account, if anything, such sum as will, if paid now, fairly compensate him for what the evidence shows he was reasonably likely to have gained in profit from the raising of other hogs in 1958. But you will not allow him on this account more than $4,000."

Holding with the trial court, as we do, that the jury

could find this is a proper case for rescission of the contract of sale, did the challenged instruction guide the jury properly as to the measure of damages it might allow defendant in case it found him entitled to recover on his counterclaim? We believe the court committed error in giving the last paragraph of the instruction. It is our view the question of whether or not Reese "lost earnings or profits in the raising of other hogs for the year 1958, because of his keeping and holding [as bailee] the hogs sold to him by Benshoof" was a matter too remote and speculative to be submitted to the jury.

Section 554.70, Code, 1954, provides: "* * * 5. Where the buyer is entitled to rescind the sale and elects to do so, if the seller refuses to accept an offer of the buyer to return the goods, the buyer shall thereafter be deemed to hold the goods as bailee for the seller, * * *."

The damages here sought are not for breach of warranty but are damages sustained because of holding the property as bailee for the seller. The burden, of course, rests upon the appellee to prove by competent evidence the financial loss suffered by him as a result of having to hold the hogs for the seller, who refused to take them back. Fraud was not alleged or proved. The question for determination at this point is whether or not Reese is entitled to recover for loss of possible profits he might have had if he had kept the twenty stock sows he marketed soon after learning some of the Benshoof sows had rhinitis, thereby losing anticipated profits from raising litters of pigs from said stock sows.

Testimony was received over proper objection that in certain preceding years the average number of pigs per litter saved and raised on appellee's farm was as low as six and up to ten and that the average profit per pig raised and sold in 1957 was between $20 and $25. The mere difficulty of ascertaining and measuring damage will not justify the denial of recovery therefor but the right to damages must be proved by competent evidence. Swift & Co. v. Redhead, 147 Iowa 94, 104, 122 N.W. 140. It is well settled that special damages may be allowed in proper cases in addition to general damages. It is also axiomatic that damages should be precisely commensurate with the injury, neither more nor less. Love & Co. v. Ross, 89

Iowa 400, 56 N.W. 528; Joy v. Bitzer, 77 Iowa 73, 41 N.W. 575, 3 L.R.A. 184; Short v. Matteson, 81 Iowa 638, 47 N.W. 874. In Love & Co. v. Ross, supra, it was held that the difference in the amount realized from the services of a stallion and what would have been realized had he been as warranted was not recoverable, being too remote and speculative.

"According to some authorities, the line of distinction between profits which are remote, consequential, or not within the contemplation of the parties and those which are proximate and absolute and certain and within the contemplation of the parties seems to rest in the question whether they are to arise directly out of the contract in question or its subject-matter and to constitute the immediate fruits of the contract or whether they are to result from collateral engagements or enterprises." 15 Am. Jur., Damages, section 152, page 565.

"Profits are usually considered too remote, however, which are not the immediate fruits of the principal contract but are dependent on collateral engagements and enterprises, not brought to the notice of the contracting parties, and not, therefore, brought within their contemplation or that of the law." 15 Am. Jur., Damages, section 154, page 569.

We hold it was error to submit to the jury the question whether "Reese lost earnings or profits in the raising of other hogs" in 1958.

There is evidence in this case that swine not affected with rhinitis may be adequately protected from the disease by keeping them fifty feet or more away from animals which are affected by it and away from contaminated premises. It was also testified that the disease is not inherited, that a large per cent of hogs slaughtered show evidence of the disease but that quite generally it cannot be discovered by clinical examination and that in many cases the head of an animal must be posted in order to discover its presence. It was shown to be the practice of some breeders to proceed as though the disease were not present and when it appeared such afflicted animal was destroyed, without extensive damage to the owner. Reese could possibly have protected his stock sows by isolation on his 80-acre farm and could have raised and marketed their litters. This would have caused him some inconvenience and additional expense

which a jury might have allowed as a proper element of damage. It must be remembered this is not a case where disease was transmitted nor is it a case where there was likelihood of its transmission if the diseased hogs were adequately isolated. It was appellee's duty to minimize the damages as much as possible if he expected to hold Benshoof for them. In this instance, however, the damages claimed by reason of loss of possible profits are remote, speculative and conjectural and dependent upon a more or less collateral enterprise.

II. In Division II it is claimed the court erred in admitting evidence as to the failure of certain sows to farrow and in regard to compromise negotiations. The evidence was that all Benshoof sows did farrow except one and she was with pig when slaughtered at Ames. The testimony objected to as in the nature of compromise negotiations was brought out in connection with testimony bearing on the rescission of the contract, being part of a material conversation between Reese and Benshoof's attorney. Reese did not propose a compromise. He wanted to rescind and return all the hogs. It was plaintiff's attorney who proposed a compromise. This evidence was material, competent and not prejudicial.

III. Division III complains of instructions considering the sale of the nine hogs and the hog equipment as one sale, assails Instruction No. 22 as directing that a breach as to any of the animals would be a breach as to all, and insists the court erred in not instructing that as to the five animals not claimed to be diseased the plaintiff was entitled to recover the entire purchase price. As pointed out by the trial court, appellant treated the transaction as one when he brought suit on the check. The case was submitted to the jury on the theory pleaded by the parties. The shift in theory was first made when objections to the instructions were interposed. Until then the transaction was considered as one contract and not severable. In Lahiff v. Keville, 184 Iowa 1334, 169 N.W. 751, two horses were placed in the auction ring with equal warranty and with the option of the bidder to take either horse at the price bid or both at double that price, and this court held the jury was justified in finding that the contract was entire and not severable and therefore rescindable as to both horses for breach of

warranty as to one. The question whether the purchases should be deemed separate transactions or whether they should be deemed reduced to one contract is wholly a question of the intent of the parties. Schaffer v. Hoch, 184 Iowa 23, 168 N.W. 107. 77 C. J. S., Sales, section 101. The provision in section 554.22 that "1. Where goods are put up for sale by auction in lots, each lot is the subject of a separate contract of sale" does not preclude the parties from agreeing otherwise. Reese wished to buy a small herd of purebred hogs free from disease and obviously it was his intention not to start a herd with diseased hogs or hogs exposed and coming from an infected herd. Purchase of an infected herd clearly was never within his contemplation.

█ IV. Did the court err in submitting to the jury the issue of express warranty? We hold it did not. Section 554.13 defines an express warranty thus: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. * * *." Appellee was furnished and relied upon a sale catalogue which contained this statement: "A health certificate will accompany each animal. Dr. John Morton, Webster City, does our veterinary work and will be on hand sale day to vouch for the health of our herd." Appellee testified that Doctor Morton made a public announcement at the sale. "He said he had been just practically living with the hogs for some time; * * * and they was free from all diseases; they was tops." The evidence was such the jury could find therefrom that the hogs were sold under an express warranty within the meaning of the statutory definition.

█ V. It is urged the court erred in giving Instruction No. 11 as to implied warranty for the reason that there was no evidence plaintiff had knowledge of the intended purpose of Reese in buying the hogs or that Reese relied upon plaintiff's skill as a breeder. It is undisputed Reese bid $3035 for nine Hampshire hogs worth approximately $700 on the market. The price of the boar was $585. The catalogue stated Treasure Acres Farm paid $6000 for him in 1956. On the record the jury could well find that the buyer, by implication and by his purchase,

made known to the seller the purpose for which the hogs were bought, that the buyer relied upon the seller's skill and judgment and that he did not at or before the sale have an opportunity to make an examination of the hogs such as would enable him to discover their diseased condition. The jury could also find from the evidence properly admitted that the boar, sows and gilts were not reasonably fit for breeding purposes within the contemplation of the parties. We cannot disapprove the instruction.

VI. Instruction No. 13 is attacked on the ground it did not instruct the jury that the right to rescission, if it existed, was waived if appellee disposed of the animals by sale or exercised ownership over them. It is contended slaughtering three sows was an assertion of ownership. Appellant refused to take back any of the stock, thus forcing appellee to handle it for the bailor as best he could. As to his authority to destroy the three sows, Reese testified: "A. The veterinarian [referring to Dr. John Morton, plaintiff's veterinarian] said we should take some hogs to Ames to have them posted. Mr. Blackburn [one of plaintiff's attorneys] agreed to it. Bob Faint [plaintiff's farm manager] agreed to it. I agreed to it and my lawyer agreed to it." Appellee sold the boar and four sows on the market after keeping them for a considerable period. In this he was within his rights, the proceeds being held for appellant. "* * * He should so handle or dispose of the property as to protect the interests of both parties, and he may, in good faith, and using reasonable care and judgment, resell the property for the seller's account, * * * at the expiration of a reasonable time he should sell the property." 77 C. J. S., Sales, section 118.

It is claimed appellee did not account for the loss of 24 pigs. We think it is a fair inference from the competent evidence that they were lost in the course of the hog raising operation.

VII. Other contentions of appellant have been considered and found to be without merit.

For the errors pointed out a reversal is necessary.—Reversed and remanded.

All JUSTICES concur.