**J & J FARMS, INC., a Corporation, Appellant,**

v.

**CARGILL, INC., a Corporation, Appellee.**

Nos. 81–1763, 81–1800.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1982.

Decided Dec. 3, 1982.

Rehearing and Rehearing En Banc Denied Jan. 3, 1983.

Robert R. Eidsmoe, Charles T. Patterson, Gleysteen, Harper, Eidsmoe, Heidman & Redmond, Sioux City, Iowa, for appellant.

Before HENLEY * and McMILLIAN, Circuit Judges, and MEREDITH,** Senior District Judge.

PER CURIAM.

J & J Farms, Inc. (J & J) appeals from a final judgment entered in the District Court for the Northern District of Iowa awarding J & J actual damages but setting aside the jury's award of $1 million in punitive damages on motion for judgment n.o.v. by Cargill, Inc. For reversal J & J argues that the district court applied the wrong standard of review in granting the motion for judgment n.o.v. J & J also argues that the district court erred in excluding certain evidence and in denying the motion to compel Cargill to disclose certain financial information. By cross-appeal Cargill challenges the jury's award of $50,603 in consequential damages. For the reasons discussed below, we hold the district court properly set aside the punitive damages but erred in awarding $50,603 in consequential damages. Accordingly, we affirm in part, reverse in part and remand for remittitur of actual damages by $50,603.

J & J is a family-held Oklahoma corporation engaged in several agricultural activities, including the operation of a feedlot. J & J buys young cattle, raises them to a specific weight, and then sells them to other feedlot operators who "finish" the cattle by raising them to slaughter weight. Cargill is one of the world's largest agribusinesses; it owns and operates hundreds of grain elevators, including one located in Alta, Iowa. The Alta elevator is managed by Dean Radke. On February 27, 1980, J & J purchased two truckloads of corn screenings from the Alta elevator. The purchase was arranged through two grain brokers: Darrell Hartman of Van Iperen Feed and Grain in Iowa and Marion Perdue of Kingfisher

Patrick McLarney, Laurel H. Corn, Shook, Hardy & Bacon, Kansas City, Mo., John J. Greer, Dick H. Montgomery, Greer, Nelson, Bertell, Montgomery, Barry & Bovse, Spencer, Iowa, for appellee.

* The Honorable J. Smith Henley assumed senior status on June 1, 1982.

** The Honorable James H. Meredith, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

County Feedyard in Oklahoma. Corn screenings are produced when corn is screened to separate the whole kernels from broken kernels, dust and other foreign matter and are sold for use as livestock feed. The corn screenings were transported by truck by Van Iperen and delivered to J & J late in the afternoon on February 28. The corn screenings were unloaded into a large bunker silo containing other livestock feed. J & J began feeding the corn screenings to cattle on February 28 or 29 and continued to do so until March 10. At that time the corn screenings were almost gone.

Unknown to the parties at the time of the sale on February 27, part of the Alta elevator was contaminated with a pesticide, aldrin. The source and extent of the contamination is not known. Aldrin was widely used in the Midwest against corn rootworms until 1974, when the Environmental Protection Agency banned it from agricultural uses because it caused cancer in laboratory animals. Aldrin is extremely toxic and highly persistent. Trace amounts can be detected in the environment, particularly in soil samples. When animals eat feed contaminated with aldrin, the animals convert the aldrin into dieldrin, another form of aldrin. Dieldrin tends to accumulate in the animals' fatty tissues, liver and bone marrow. At trial expert witnesses testified that the Food and Drug Administration (FDA), in cooperation with the United States Department of Agriculture, has established "action levels" or tolerance levels of .03 parts per million (ppm) for aldrin or dieldrin in feed grains and .3 ppm for aldrin or dieldrin in animals. The marketing of feed grains or livestock with concentrations of aldrin or dieldrin equal to or higher than the action levels is unlawful.

The FDA notified J & J of the aldrin contamination at the Alta elevator on March 10. J & J had planned to market the cattle in early March 1980. Acting upon the advice of its local veterinarian and FDA investigators, J & J delayed marketing the cattle which had been fed the Cargill corn screenings and had them tested for dieldrin. The test results were positive for dieldrin but well below the action level of .3 ppm.

Again acting upon the advice of its veterinarian and a veterinary toxicologist, J & J had the cattle retested. The second test results were similar to the first: positive for dieldrin but below the action level. J & J then sold the cattle on April 23, 1980. During the six weeks that the cattle were being tested, the cattle market declined. None of J & J's cattle exceeded the FDA action level for aldrin or dieldrin; however, all of the samples taken from J & J's cattle were positive for dieldrin and some of the samples showed concentrations of dieldrin at .24 ppm. According to the testimony of expert witnesses, any test result showing concentrations of aldrin or dieldrin above .005 ppm is considered positive.

J & J brought this action for actual and punitive damages alleging that Cargill negligently sold the corn screenings without adequate testing and without adequate warning of possible aldrin contamination and breached the implied warranty of merchantability by selling contaminated corn screenings. J & J also alleged that Cargill knew about the aldrin contamination at the Alta elevator on the morning of February 29 but intentionally misrepresented the status of the aldrin investigation and the severity of the contamination in order to protect its position in prospective litigation against another customer.

At trial J & J introduced the following evidence in support of its position. On February 13, 1980, two weeks before the sale to J & J, the FDA was investigating the Alta elevator as a possible source of an aldrin contamination which had been discovered at Bryant Beef, Inc. Bryant Beef is a large Iowa producer of cattle and hogs and one of the Alta elevator's largest local customers. The FDA was checking the corn sales records to determine if the Alta elevator was the source of the contamination. Radke relayed the information about the FDA's Bryant Beef investigation to Cargill's headquarters staff in Minneapolis. On February 25, Bryant Beef informed Cargill that the FDA believed that corn was the probable source of the Bryant Beef contamination. Cargill began its own investigation

and began taking samples from the Alta elevator. Kent Norby was in charge of the Cargill investigation. On February 27 the first test results of samples taken from the Alta elevator showed aldrin present in concentrations far below the FDA action level. This was the day the two truckloads of corn screenings were sold to J & J. On February 28, Cargill received additional test results that showed similar very low concentrations of aldrin.

On February 29, at about 7:45 a.m., Norby learned that sample 19 showed a concentration of aldrin at 4.6 ppm, far in excess of the FDA action level of .03 ppm for feed grains. Sample 19 had been taken on February 27. Norby ordered a retest of sample 19 and spent most of that morning in a meeting with attorneys for Cargill and Bryant Beef. Bryant Beef had threatened to bring a multimillion dollar lawsuit against Cargill for causing the contamination and quarantine of its livestock. (Bryant Beef filed its lawsuit against Cargill for $25 million in damages on March 4; the Bryant Beef litigation has been settled.) Norby testified that Cargill's attorneys advised him and other Cargill employees investigating the Alta elevator not to volunteer information about the test results in light of the prospective Bryant Beef litigation. At about 4:00 p.m., Norby discussed the status of the FDA investigation with the regional FDA office but did not disclose the 4.6 ppm test result. At about 5:00 p.m., the Cargill headquarters staff informed Radke of the 4.6 ppm test result and instructed him to shut down the Alta elevator for cleaning, to notify the customers of the possibility of aldrin contamination, and to try to obtain samples. Radke closed the Alta elevator and stopped all sales of corn and corn screenings. Orders were filled from other Cargill elevators. The Alta elevator was closed from March 1 to March 3. At about 5:30 p.m. Radke called Hartman at Van Iperen and learned that the two truckloads had been shipped to J & J. Hartman told Radke to call Perdue at Kingfisher County Feedyard. At about 6:00 p.m. Radke tried to call Perdue but did not reach him. Radke had Perdue's home

phone number but did not attempt to call Perdue at home.

The next day, March 1, at about 8:00 a.m., Hartman called Perdue and told him that there was a possible chemical contamination problem at the Alta elevator. About fifteen minutes later Radke called Perdue. Perdue testified that Radke said there was a possible aldrin contamination problem at the Alta elevator, but that Cargill did not think the problem was very serious, and that Cargill wanted samples of the corn screenings to satisfy government inspectors. Perdue testified that Radke did not sound very worried, did not tell him about the 4.6 ppm test result, did not warn him against feeding the corn screenings, and did not tell him that the Alta elevator had been closed temporarily. Perdue further testified that he told Radke that it might be hard to get a sample because he thought the corn screenings had already been fed to cattle. About fifteen minutes later Perdue called Allan Jensen of J & J. Perdue told Jensen what Radke had told him—that there was a possible aldrin contamination problem at the Alta elevator, but that the problem was not serious and that Cargill wanted samples of the corn screenings for government inspection. Jensen testified that he took samples from the corn screenings in the bunker silo and that he continued to feed his cattle the corn screenings because, on the basis of the information Radke had told Perdue, he believed the problem of possible contamination was not serious.

On March 4 Norby had received the results of the retest of sample 19, confirming the presence of aldrin at a concentration of at least 4.6 ppm. Three other samples showed aldrin at concentrations from 2.4 ppm to .14 ppm. Other samples, however, showed very low concentrations. The high test results came from samples taken from the "old house" at the Alta elevator. At least some of the corn screenings sold to J & J had been stored in the old house. It is very difficult to trace the exact location of particular shipments of grain through the elevator. On March 6, Norby told the FDA investigators about the high test results of

samples taken from the old house at the Alta elevator. On March 10 the FDA investigators notified J & J of the aldrin contamination at the Alta elevator. By this time most of the corn screenings delivered on February 28 had already been fed to the cattle.

At trial J & J argued that Cargill intentionally misrepresented the aldrin contamination problem and that if it had known of the 4.6 ppm test result, it would have stopped feeding the corn screenings to its cattle. A veterinary toxicologist testified on behalf of J & J that aldrin or dieldrin contamination in animals is cumulative. The toxicologist testified that it was possible that one day's feeding of contaminated corn screenings could have produced the level of dieldrin contamination found in J & J's cattle if the concentration of aldrin was 4.6 ppm, but that the dieldrin contamination found in J & J's cattle could have been the result of three to ten days' consumption of corn screenings containing aldrin at a concentration of .54 or .55 ppm. The lower concentration level was a hypothetical concentration which took into consideration the mixture of the corn screenings with other feed, the amount of feed consumed per day, the duration of feeding, and the metabolism and retention of aldrin or dieldrin by cattle. According to the deposition testimony of another veterinary toxicologist consulted by J & J, concentrations of aldrin at levels of .44 ppm and .16 ppm were detected in two samples taken from the bunker silo where the corn screenings from Cargill had been unloaded. Other veterinary toxicologists testified on behalf of Cargill that, according to their calculations, feeding cattle corn screenings containing aldrin at a concentration of .54 or .55 ppm for eleven days (February 29 through March 10) would not produce the level of dieldrin contamination found in J & J's cattle and that the contaminated corn screenings from the Alta elevator could have accounted for only a small part of the dieldrin contamination found in J & J's cattle. They believed that

the level of dieldrin was probably due to contamination from other sources.

After a week and a half long trial, the jury found in favor of J & J on both counts and awarded J & J $158,005 in actual damages, including $50,603 in consequential damages for the disruption of J & J's planned marketing program, and $1 million in punitive damages. On motion for judgment n.o.v. the district court let stand the actual damages but set aside the punitive damages and entered judgment under Fed. R.Civ.P. 54(b) on the liability and damages issues. *J & J Farms, Inc. v. Cargill, Inc.,* No. C–80–4036 (N.D.Iowa June 30, 1981) (order). Both parties appealed.

■■■ J & J first argues that the district court applied the wrong standard of review in ruling on the motion for judgment n.o.v. J & J argues that the district court erroneously used the discretionary standard of review for motions for new trial rather than the narrower, nondiscretionary standard of review for motions for judgment n.o.v. On the merits J & J argues that the evidence and the reasonable inferences to be drawn from that evidence raised a submissible jury question and that the district court improperly substituted its judgment for that of the jury.

We have carefully reviewed the memorandum opinion of the district court and conclude that the district court did not apply the wrong standard of review in ruling on Cargill's motion for judgment n.o.v. We agree with J & J that the district court's reference to discretion and its citation to *Krall v. Crouch Bros.,* 473 F.2d 717 (8th Cir.1973), are somewhat confusing. We note, however, that the district court expressly acknowledged and applied the standard of review set forth in *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 857 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). *See J & J Farms, Inc. v. Cargill, Inc.,* slip op. at 5 & n. 3, 7. The *Griggs* standard of review [1] for motions

---

1. [I]n passing upon the motion for judgment [n.o.v.] the trial court and [the appeals] court are

(1) to consider the evidence in the light most favorable to the plaintiffs as the parties prevailing with the jury; (2) to assume that all

for judgment n.o.v. was affirmed in *Singer Co. v. E.I. du Pont de Nemours & Co.,* 579 F.2d 433, 440–41 (8th Cir.1978) (citations omitted, emphasis in original):

> In reviewing the evidence on a motion for judgment n.o.v., a court must give the party securing the jury verdict the benefit of all reasonable inferences to be drawn from the evidence. The verdict, however, must be supported by substantial evidence; a mere scintilla is not enough. In making that determination, the record must be examined and the testimony reviewed without assigning credibility or weight to the witnesses and evidence. A trial court cannot substitute its judgment of the facts for that of the jury, and should grant a judgment n.o.v. "only where the evidence points *all* one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." An appellate court follows the same standards as the trial court in testing the propriety of a judgment n.o.v.

*See generally* 9 C. Wright & A. Miller, Federal Practice & Procedure §§ 2524 (motions for directed verdict), 2531 (motions for new trial), 2540 (motions for judgment n.o.v.) (1971).

The district court explained its decision to grant the motion for judgment n.o.v. as follows:

> The Court, in evaluating and reviewing the evidence, is of the opinion the record is devoid of any malicious, wanton or oppressive conduct by [Cargill]. [J & J] argues [Cargill] and its employees acted in callous disregard to [J & J] in not fully informing [J & J] of the contamination and the risks involved in feeding [J & J's] cattle this contaminated feed.
>
> The Court, however, is of the opinion that [Cargill's] conduct, once it learned of

possible contamination, did not arise to a level which would allow punitive damages. [Cargill] did notify Marion Perdue [of Kingfisher County Feedyard, one of the grain brokers] of the possible contamination, but was told the screenings were probably already fed. Notifying Perdue of the possible contamination does not show malicious, wanton or oppressive conduct. True, [Cargill] could have done more. [J & J] argues that prior to the call to Perdue, Cargill officials, after weighing the pros and cons, intentionally made a decision to ignore J & J's problem and that this constituted improper marketing behavior. The evidence presented, taken in the best light of [J & J], does not support this proposition. If this were their course of action, why call the trucking firm Van Iperen to find out where the screenings went? Then when [Cargill] found that Van Iperen had trucked it to Perdue in Oklahoma, why call him? Or why ask him for samples?

Under the circumstances, [Cargill's] failure to act as [J & J contends] they should have is, after applying the test set out in the *Firestone* case ..., at most negligent conduct, not maliciousness, oppressiveness or wantonness.

*J & J Farms, Inc. v. Cargill, Inc.,* slip op. at 5–7. The basis for the district court's granting the motion for judgment n.o.v. thus seems to be that, as a matter of law, a finding of malicious, wanton or oppressive conduct was foreclosed because Cargill attempted to find out what had happened to the corn screenings and to obtain samples and did notify Purdue of the possible contamination. In other words, the district court concluded that Cargill did not "ignore" J & J's problem.

■ We agree with the district court's decision granting Cargill's motion for judg-

---

conflicts in the evidence were resolved by the jury in favor of the plaintiffs; (3) to assume as proved all facts which plaintiffs' evidence tends to prove; (4) to give the plaintiffs the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could

differ as to the conclusions to be drawn from it.

*Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 857 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), *citing Hanson v. Ford Motor Co.,* 278 F.2d 586, 596 (8th Cir.1960).

ment n.o.v. and setting aside the punitive damages award. Under Iowa law punitive damages may be awarded upon a showing of actual damages and legal malice[2] or "malicious, wanton or oppressive conduct." *See Amos v. Prom, Inc.,* 115 F.Supp. 127 (N.D.Iowa 1953) (tort); *Pogge v. Fullerton Lumber Co.,* 277 N.W.2d 916, 919–20 (Iowa 1979) (breach of contract).

When considered in the light most favorable to J & J, the evidence showed that Cargill was at most negligent in failing to adequately warn its customers. Cargill conducted its own investigation, cooperated with the FDA investigation, and, when it learned of the high test result, did contact its customers to warn them of the possibility of aldrin contamination. These actions are inconsistent with the "willful disregard" or "complete indifference" to the rights of others necessary to recover punitive damages. *E.g., McCarthy v. J.P. Cullen & Son Corp.,* 199 N.W.2d 362, 368–69 (Iowa 1972).

In view of our affirmance of the district court's judgment n.o.v. on punitive damages, we do not reach J & J's remaining arguments.[3]

On cross-appeal Cargill argues that the district court erred in sustaining the jury's award of $50,603 in consequential damages, pursuant to Exhibit 32, for the disruption of J & J's planned marketing program. Cargill argues that such damages were too remote and speculative. Exhibit 32 represented a calculation of J & J's estimated losses due to the disruption of its planned marketing program. J & J argued that as a result of the delay in marketing the contaminated cattle, it lost about $100,000, which J & J argued represented an actual loss of about $500,000 in working capital. J & J argued that it planned to use this $500,000 to purchase about 1,000 feeder cattle, that it had the capacity to raise additional feeder cattle, and that, after deducting expenses, it would have made a profit of $50,603 from the sale of the additional cattle. The district court concluded that the consequential damages represented by Exhibit 32 were neither too speculative nor unforeseeable. *J & J Farms, Inc. v. Cargill, Inc.,* slip op. at 3–4.

We disagree. J & J properly recovered its lost profits due to the decline of the market during the time the contaminated cattle were being tested. *E.g., Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634, 639–43 (8th Cir.1975) (Iowa law); *Shinrone, Inc. v. Tasco, Inc.,* 283 N.W.2d 280, 286 (Iowa 1979). By comparison, the losses due to the disruption of the planned marketing program did not arise directly out of the contract in question or its subject matter, but were the projected result of a collateral or secondary enterprise and thus too remote and speculative. *See Benshoof v. Reese,* 250 Iowa 868, 97 N.W.2d 297, 300–01 (1959) (loss of profits represented by raising of other hogs, which had been sold upon discovery of disease in hogs subject to contract at issue, held not recoverable because "re-

---

2. Unfortunately, much confusion surrounds the use of the term "malice" in punitive damages analysis. For a thorough and thoughtful examination of Iowa case law on punitive damages, see Ellis, *Punitive Damages in Iowa Law: A Critical Assessment,* 66 Iowa L.Rev. 1005, 1019–25 (1981). Professor Ellis suggests substituting a standard of "outrageous" conduct for "legal malice." *Id.* at 1023.

3. J & J argues that the district court erred in excluding a news release issued by Cargill on March 1, 1980, and the testimony of a television news reporter who had called the Cargill headquarters offices on March 1, 1980. The district court excluded this evidence, in part because it involved a related but collateral and widely publicized incident, the contamination and quarantine of livestock at Bryant Beef. J & J also argued that the district court erred in denying its motion to compel Cargill to disclose certain financial information. Iowa law favors the disclosure and admissibility of current financial information in punitive damages cases. *See Hall v. Montgomery Ward & Co.,* 252 N.W.2d 421, 424 (Iowa 1977). J & J was permitted to inform the jury that Cargill is the world's largest agribusiness, employs more than 30,000 persons, has over $1 billion in assets, and has over $100 million in net annual earnings. Neither party disputed the *amount* of the punitive damages award before the district court or on appeal; the parties disagreed about the submissibility of the issue of punitive damages.

mote, speculative and conjectural and dependent upon a more or less collateral enterprise"). J & J cannot recover lost profits from the marketing of *other* cattle which it could have purchased with the lost profits from the marketing of the contaminated cattle.

Accordingly, we affirm the judgment n.o.v. on punitive damages and the award of actual damages in the amount of $107,-402. We reverse the award of $50,603 in consequential damages and remand for remittitur of actual damages in the amount of $50,603.

McMILLIAN, Circuit Judge, concurring in part and dissenting in part.

I concur in the reversal of the award of $50,603 in consequential damages. I would reverse the judgment n.o.v. on punitive damages and therefore dissent from that part of the opinion. In my opinion, the evidence, when considered in the light most favorable to J & J, showed that Cargill knew that aldrin is a dangerous chemical, that aldrin contamination of feed grains could be a serious problem and cause the quarantine of animals fed contaminated feed, and that the FDA was investigating the Alta elevator as a possible source of aldrin contamination in connection with the quarantine of the livestock of another Cargill customer. The evidence showed that, during its investigation of the Alta elevator, Cargill had received a high test result from a sample taken from one of the corn screenings storage bins at the Alta elevator. The evidence also showed that Cargill contacted its corn screenings customers, but intentionally misrepresented or concealed the status of its aldrin investigation and the severity of the contamination in order to protect its position in prospective litigation against another Cargill customer. I would conclude that substantial evidence supported the jury's finding of legal malice: Cargill acted in willful disregard for the rights of another when it failed to adequately warn J & J by intentionally concealing material information about the aldrin investigation and contamination. I

disagree with the district court's conclusion that Cargill's attempts to find out what had happened to the corn screenings precluded a finding of legal malice as a matter of law. I believe that Iowa would not hold as a matter of law that evidence of some remedial action taken by the defendant would bar the recovery of punitive damages. *See McCarthy v. J.P. Cullen & Son Corp.,* 199 N.W.2d 362, 369 (Iowa 1972) (some construction); *Claude v. Weaver Construction Co.,* 261 Iowa 1225, 158 N.W.2d 139, 146 (1968) (manifestations of solicitude, use of modern equipment, some effort to reduce nuisance). Further, Iowa case law suggests that reliance upon the advice of counsel could not be a successful defense. *Cf. Blessum v. Howard County Board of Supervisors,* 295 N.W.2d 836, 849 (Iowa 1980) (breach of contract).