**MIDAMAR CORPORATION, Appellant,**

v.

**NATIONAL–BEN FRANKLIN INSURANCE COMPANY OF ILLINOIS and Marine Office of America Corporation, Appellees,**

**MIDAMAR CORPORATION, Appellee,**

v.

**NATIONAL–BEN FRANKLIN INSURANCE COMPANY OF ILLINOIS and Marine Office of America Corporation, Appellants.**

**Nos. 89–1014, 89–1064.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1989.

Decided March 14, 1990.

Rehearing Denied May 10, 1990.

Richard S. Fry, Cedar Rapids, Iowa, for appellant.

Richard D. Zito, Sibley, Iowa, for appellees.

Before ARNOLD and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Plaintiff Midamar sued its insurers, defendants National Ben Franklin Insurance Company of Illinois and Marine Office of America Corporation, after they refused to pay a claim made by Midamar in October, 1985, when goods Midamar had shipped to Saudi Arabia were damaged during customs inspections. The trial court directed a verdict in the insurers' favor on plaintiff's bad faith claim, and a jury found in the insurers' favor on plaintiff's breach of contract claim. The jury found the insurers liable under a promissory estoppel theory, however, and awarded plaintiff damages totalling $290,810.60.

After the jury returned its verdict, the trial court granted defendant's motion for a directed verdict on a portion of the damages, and entered judgment in Midamar's favor for $35,000 plus interest. The court denied defendants' post-trial motions for judgment notwithstanding the verdict or in the alternative for a new trial. Both sides have appealed. We affirm the district court's judgment on liability, but reverse in part as to the proper measure of damages.

### I.

We view the facts in the light most favorable to the jury's promissory estoppel verdict in favor of plaintiff. So viewed, the

---

* The Honorable EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

facts reveal that plaintiff Midamar was created by William Aossey in 1974. Midamar exported Iowa agricultural and related products to countries in Africa and the Middle East. Its sales had increased to over five million dollars by 1984 through contacts Aossey had developed while working in the Peace Corps and through other government-sponsored projects. In 1982, Aossey purchased an "all-risk" marine insurance policy for his food shipments from Edward Fleck, a soliciting agent of defendants. Aossey testified that Fleck had informed him the policy would cover damage that occurred in customs inspection or port clearance.[1] At this time, sales to Saudi Arabia constituted approximately half of Midamar's overseas sales.[2]

In 1985, Midamar sought to improve its distribution of meat products in Saudi Arabia by working with a Saudi company, Shehata For Trading, which had its own cold storage facilities in Jeddah and which was engaged in the distribution of foods to supermarkets and other Saudi businesses.[3] Shehata's first purchase from Midamar resulted in the shipment of $58,572.22 of meat products in July, 1985. Shehata's second purchase is the subject of this litigation. In August, 1985, Midamar shipped a forty foot refrigerated container of frozen meat and seafood products to Shehata. The invoice price of the goods was $147,705.97.

As was its custom, Midamar had borrowed funds from its bank to pay for the goods. When Midamar's customer paid for the goods, the funds would go directly to the bank to pay off the loan. In addition to Midamar's "all-risk" marine insurance, the bank carried a Foreign Credit Insurance Association (FCIA) policy to insure against certain losses in the event of non-payment by Midamar's customer.

The goods for Shehata arrived in Jeddah in September, 1985, and were subject to an unusually long series of inspections by Saudi customs officials, who were inspecting all shipments from the United States and West Germany for contraband and arms. On September 25, 1985, Midamar received a telex from Shehata stating "Just received meat container. Tremendous amount of damage. Need for you to call immediately." Aossey's brother Albert was in Riyadh installing a restaurant facility at the time the telex was received, and Albert contacted the insurers' designated settling agent in Saudi Arabia, Near East Agencies, to inform them of the damage. Midamar also gave written notice to the shipping company and the insurers that the shipment was received in a damaged condition.

Near East Agencies hired Thomas Howell Kiewit, an international loss adjusting company, to assess the damage. The survey report, dated October 31, 1985, notes "crushed, torn and opened cartons" and "serious defrosting damage" in some products upon initial survey on September 28. The report states that "segregation was required to assess the loss," but Shehata had not performed the segregation because "[a]s the consignment had arrived in a damaged condition, they considered the shipment as not being received until the claim was settled."

Aossey arranged to fly from Egypt, where he was attending a meeting, to Saudi Arabia to assess the situation. Aossey testified that when he arrived he found over half of all the packages of meat had been opened and/or opened and damaged. After Aossey worked to sort the inedible goods from the rest, Kiewit's representative surveyed the damage and concluded 809 cartons with a value of $56,129.46 were damaged. Kiewit's report states the agent

---

1. Aossey testified he switched insurers in 1982 because he became dissatisfied with the performance of the company that had been insuring his shipments when difficulties arose with respect to a shipment of beef to the Meridian International Hotel in Jeddah, Saudi Arabia.

2. Midamar had developed bi-lingual labels for Louis Rich and Oscar Mayer meat products, and could supply meat from those companies which

had been processed according to the religious requirements of the Moslem religion and which had labels in the Arabic language.

3. Aossey testified that Saudi law prohibited a foreigner from employing a salesperson, setting up an independent sales office, or constructing cold storage facilities in Saudi Arabia. "You have to go through a Saudi sponsor."

was able to convince Aossey that some salvage of loose pieces was possible, and so they agreed a depreciation of 60% was "fair and reasonable," for a total loss of $35,000. In a section labeled "Cause of the Damage," the report states "The entire consignment was unloaded, cartons opened etc., checked and re-loaded in a very poor manner." The report concludes: "Based on our findings, we came to the conclusion that the damage to this consignment is entirely due to customs inspection."

Before he left Saudi Arabia, Aossey was told by Near East Agencies' general manager that the $35,000 in damage was covered. In reliance on this promise, Aossey agreed that Shehata could pay the balance of the invoice to the bank after the insurance proceeds had been applied to reduce the amount due from Shehata.[4] The insurers never paid the $35,000, and Shehata never paid the balance due.

Instead, almost immediately after receiving Midamar's claim for damage, the insurers cancelled Midamar's policy effective November 1, 1985. In December, Aossey accepted an offer of $7,000 in settlement of two other outstanding claims which he valued at $15,000, believing that prompt receipt of the $35,000 would follow and he could then collect the remaining balance from Shehata. Defendants never indicated at the December meeting that they had any problem with Midamar's $35,000 claim. Three months later, however, the insurers denied the claim on the ground that the "all-risk" policy excluded coverage for damage due to variation in temperature.[5] At the same time, the insurers sent a telex to Near East Agencies indicating their "final position" was "negative" on Midamar's claim and requesting that, in the future, "[w]ould appreciate it if surveyor/you would refrain from giving comments to claimants about insurance coverage of individual claims."

Because Midamar was unable to obtain payment from Shehata to repay its loan, the bank sought to collect on the FCIA policy. The Foreign Credit Insurance Association eventually paid $56,895 towards the loss. At trial, Midamar presented testimony, through Aossey, that the insurers knew that Shehata would not pay for the goods until the insurance claim was settled; that Near East Agencies represented the loss was covered; that Midamar agreed in reliance that Shehata could wait for the insurance payment of $35,000; and that Midamar's losses from the insurers' refusal to pay included (1) the $35,000 agreed damage, (2) the remaining $55,810 due from Shehata on the invoice,[6] (3) a $100,000 reduction in Midamar's line of credit at the bank; (4) a reduction in Midamar's working capital; and (5) lost profits in 1986, 1987, and the first part of 1988.

## II.

On appeal, the parties raise issues relating only to plaintiff's bad faith and estoppel claims. Plaintiff contends the court erred in refusing to submit its bad faith conduct claim to the jury. Defendant argues it is entitled to judgment notwithstanding the verdict or a new trial on plaintiff's estoppel claim, and plaintiff contends it is entitled to the full amount of damages awarded by the jury under plaintiff's estoppel theory.

### A. Bad Faith

To establish a cause of action against an insurance carrier for bad faith conduct relating to a claim made by its insured, plaintiff must show (1) the absence of a reasonable basis for denying benefits

---

4. Plaintiff presented evidence that some Saudi businesses were relatively unsophisticated and were distrustful of American companies. As a result, it was suggested Shehata feared that if it paid any amount on the invoice prior to the settlement of the insurance claim, it could be held liable for the full invoice price.

5. Defendants argued at trial that all damages were caused by defrosting and refreezing.

Plaintiff contended that the customs inspection caused the great bulk of the damage.

6. The total invoice price was approximately $147,706, less $35,000 in "agreed damage," equals $112,706, less the approximately $56,895 received from the FCIA, equals $55,810 outstanding.

of the policy and (2) defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Dolan v. Aid Insurance Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (citing *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 691, 271 N.W.2d 368, 376 (1978)). Because plaintiff has not appealed from the jury's finding that no coverage existed under the insurance contract, any error by the district court in refusing to submit plaintiff's bad faith conduct claim to the jury is harmless. The jury's finding of no coverage compels the conclusion that defendants had a "reasonable basis for denying benefits of the policy," and hence defendants could not be held liable for bad faith conduct under Iowa law.

### B. Estoppel Liability

█ The Restatement (Second) of Contracts provides a remedy for a party who, in the absence of an express contract, has relied to his or her detriment on the promise of another:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1) (1981) (cited in *Amana Society v. Colony Inn, Inc.*, 315 N.W.2d 101, 117 (Iowa 1982)).

7. Defendants argued only that a directed verdict should be granted on the issue of coverage and that any "consequential damages" beyond the $35,000 in "agreed damage" were not as a matter of law recoverable under a contract theory.

8. Some courts have held that an estoppel theory may not be used to extend insurance coverage, particularly when, as here, the representation is made *after* the loss has been incurred. *E.g., Roseth v. St. Paul Property & Liability Insurance Co.*, 374 N.W.2d 105 (S.D.1985). Other courts have more generally found insurers may be estopped to deny coverage based on representations made by their agents. *See Imperial Casualty & Indemnity Co. v. Carolina Casualty Insurance Co.*, 402 F.2d 41, 45 (8th Cir.1968) (applying Iowa law). *Accord Travelers Indemnity Co.*

The district court in this case submitted plaintiff's estoppel theory to the jury without objection from defendants, and defendants did not move for a directed verdict on the estoppel claim either at the close of plaintiff's case or at the close of all of the evidence.[7] For this reason, the district court rejected defendants' argument, made for the first time in their post-trial motions, that the jury's estoppel verdict was "inconsistent" with the verdict on the coverage question.[8] Defendants attempt to renew this argument on appeal, but we agree with the district court that "a party cannot assert a ground in a motion for judgment notwithstanding the verdict that was not previously asserted in the party's motion for a directed verdict." *Lowe v. Conlee*, 742 F.2d 1140, 1141 (8th Cir.1984); *Johnson v. Rogers*, 621 F.2d 300, 305 (8th Cir. 1980); 9 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2537 at 598 (1971).

Defendants' argument that Midamar failed to prove its reliance on defendants' promise of coverage by clear and convincing evidence must be rejected for similar reasons. Defendants simply failed to make plaintiff's estoppel theory the subject of their motion for a directed verdict. Moreover, we also agree with the district court that viewed in the light most favorable to the plaintiff, the evidence shows Near East Agencies told plaintiff the claim was covered and plaintiff reasonably relied on that statement in its relations with Shehata to its detriment.[9]

*v. Holman*, 330 F.2d 142, 150–52 (5th Cir.1964); *Tomerlin v. Canadian Indemnity Co.*, 61 Cal.2d 638, 39 Cal.Rptr. 731, 394 P.2d 571 (1964). *See generally* 16B J. Appleman & J. Appleman, *Insurance Law & Practice*, § 9090 at 598 (1981) (promissory estoppel may bind insurer). We need not resolve this issue because of defendants' failure to object to submission of plaintiff's promissory estoppel theory to the jury.

9. The court fully instructed the jury on the Iowa law of agency and concluded there was sufficient evidence that the statements made by Near East Agencies were within the scope of Near East Agencies' apparent authority as settling agent for defendants. Defendants do not contest this finding on appeal.

■ Finally, defendants urge they are entitled to a new trial on the estoppel theory because bank documents introduced at trial suggest, according to defendants, that Midamar attempted to "manufacture" damage to its line of credit at the bank.[10] Defendants argue this attempt, combined with the jury's "inconsistent" verdict, requires that a new trial be granted. Even assuming, as defendants contend, that their "manufactured damage" and "inconsistent verdict" claims were properly presented to the district court,[11] we find no abuse of discretion in the district court's denial of defendants' motion for a new trial. *See Nelson v. All American Life & Financial Corp.,* 889 F.2d 141, 151–52 (8th Cir.1989); *City of Malden v. Union Electric Co.,* 887 F.2d 157, 161–62 (8th Cir.1989); *Campbell v. Gregory,* 867 F.2d 1146, 1148 (8th Cir. 1989).

With respect to defendants' "inconsistent verdict" theory, we agree with the district court's observation that defendants "should not be granted a new trial so that a new theory of defense, not urged at the first trial, can be asserted." *See* 11 C. Wright & A. Miller, *Federal Practice & Procedure,* § 2805 at 39–40 (1973).[12] With respect to defendants' claim of "manufactured evidence," we note simply that defendants introduced the documents they rely upon in support of their theory and made a similar argument to the jury and the trial

court, and both rejected it. The district court expressly found no miscarriage of justice would occur if defendants' motion for a new trial was denied, and we find no basis for overturning the district court's judgment that defendants should be held liable to plaintiff under a promissory estoppel theory.

## C. Damages

■ We must finally consider the appropriate amount of damages. Since promissory estoppel is an equitable doctrine, the remedy may be such as is necessary to make the injured party whole or "to secure complete justice." *See generally Walters v. Marathon Oil Co.,* 642 F.2d 1098, 1100–01 (7th Cir.1981); 1A Corbin on Contracts § 200 at 221 (1963). In some cases, courts have awarded lost profits when such profits reasonably flowed from the failure to perform as promised, *see Walters,* 642 F.2d at 1100–01; *Universal Computer Systems, Inc. v. Medical Services Ass'n,* 628 F.2d 820, 825–26 (3d Cir.1980); in others, the remedy has been measured by the extent of the promisee's reliance. *See Mahoney v. Delaware McDonald's Corp.,* 770 F.2d 123, 127–28 (8th Cir.1985). *See generally* Restatement (Second) of Contracts § 90(1), comment d (1981).

The jury in this case awarded $290,810.60 to plaintiff as follows:

**10.** Defendants argued in the district court that plaintiff should not be entitled to damages because (1) documents showed Shehata refused to pay the balance of the invoice because of a business dispute with Midamar having nothing to do with insurance coverage; and (2) the bank credited payments made by Shehata and created other documents regarding Midamar's line of credit simply to "make a better case for court and jury presentation."

**11.** Plaintiff urges the Court to rule defendants are precluded from raising their "manufactured evidence" argument because it was not presented to the trial court. *See Scallen v. Commissioner,* 877 F.2d 1364, 1375 (8th Cir.1989). We agree that issues raised for the first time on appeal cannot be a basis for reversal "save in exceptional cases where the obvious result 'would be a plain miscarriage of justice.'" *Gregory v. Honeywell, Inc.,* 835 F.2d 181, 184 (8th Cir.1987) (citing *Morrow v. Greyhound Lines, Inc.,* 541 F.2d 713, 724 (8th Cir.1976)).

*See, e.g., Stafford v. Ford Motor Co.,* 790 F.2d 702, 706–07 (8th Cir.1986). While the opinions of the district court do not expressly address defendants' "manufactured evidence" claim in those terms, we believe the claim was sufficiently presented to the district court for purposes of this appeal.

**12.** Moreover, absent a special rule for insurance coverage cases, there is no reason why the jury's finding of no contract liability would be inconsistent with a finding of liability based on promissory estoppel. *See generally Walker v. KFC Corp.,* 515 F.Supp. 612, 616–17 (S.D.Cal.1981) (existence of a contract does not preclude recovery on promissory estoppel grounds). Even in states which do not normally allow the creation or extension of coverage through waiver or estoppel in pais, the doctrine of promissory estoppel may bind an insurer. 16B J. Appleman & J. Appleman, *Insurance Law & Practice* § 9090 at 598 (1981).

$35,000.00 for damage to Midamar's cargo;

$55,810.60 for Shehata's refusal to pay for the remainder of the shipment;

$100,000.00 for the bank's reduction in Midamar's line of credit;

$50,000.00 for the reduction in Midamar's working capital; and

$50,000.00 in lost profits.

In ruling on defendants' motion for a directed verdict after the jury had returned its verdict, the trial court held plaintiff could recover only the $35,000. The court reasoned that under Iowa law, consequential damages for breach of an insurance contract are available only if such damages flowed from special circumstances in the contemplation of the parties at the time of the making of the contract. *See Northwestern National Insurance Co. v. Pope*, 791 F.2d 649, 651 (8th Cir.1986); *Brown Township Mutual Insurance Ass'n v. Kress*, 330 N.W.2d 291, 298 (Iowa 1983). Because plaintiff had presented no evidence of "special circumstances" at the time the insurance contract was entered into in 1982, the court refused to award any damages to plaintiff beyond the $35,000 sum defendants' agent had promised to pay.

Assuming the limitations placed on consequential damages by the district court apply to plaintiff's promissory estoppel theory,[13] we believe the proper focus under an estoppel theory is whether the parties contemplated "special circumstances" sufficient to justify recovery at the time the *promise* was made. *See generally Nimrod Marketing (Overseas) Ltd. v. Texas Energy Investment Corp.*, 769 F.2d 1076, 1080 (5th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575, and 476 U.S. 1104, 106 S.Ct. 1948, 90 L.Ed.2d 357 (1986); Restatement (Second) of Contracts § 90(1) (1981); M. Metzger & M.

Phillips, *The Emergence of Promissory Estoppel as an Independent Theory of Recovery*, 35 Rutgers L.Rev. 472, 511–12, 544–45 (1983). In this case, plaintiff's evidence shows Near East Agencies represented to Midamar that the $35,000 claim was covered when Shehata's position was that it would not pay the balance of the invoice until the claim was settled. The insurance adjustor's report states clearly Shehata's position, and we believe this is sufficient evidence of the insurers' knowledge of "special circumstances" to support recovery of the $55,810.60 outstanding on Shehata's account, which Shehata did not pay because the insurance claim was not settled as promised.

■ We do not, however, find sufficient knowledge of "special circumstances" to support the award of any other losses, such as lost profits for the years 1986, 1987, and 1988. *See Kress*, 330 N.W.2d at 299. Moreover, we agree with the district court that damages for plaintiff's reduced line of credit and reduced working capital would presumably be subsumed in an award for future lost profits, an additional reason to withhold the award of these elements of damage. *See RET Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 421 (Iowa 1983). Finally, we agree with the district court's assessment that damages for plaintiff's reduced line of credit, reduced working capital, and lost profits in future years are too remote to be recovered in this case, because they all relate to *other* transactions which Midamar alleged it could have entered into. *See, e.g., J & J Farms, Inc. v. Cargill, Inc.*, 693 F.2d 830, 836 (8th Cir. 1983) (applying Iowa law); *Benshoof v. Reese*, 250 Iowa 868, 97 N.W.2d 297, 300–01 (1959). For all of these reasons, we agree with the district court's conclusion that plaintiff's reduced line of credit, reduced working capital, and lost profits in

---

**13.** In addition to requiring the contemplation of special circumstances, the district court also felt bound by language in our opinion in *Northwestern National Insurance Corp. v. Pope*, 791 F.2d 649, 651 (8th Cir.1986), which suggested that an insured may not recover consequential damages from an insurer when the insured's claim was "fairly debatable." *Id.* at 652. Our decision in

*Pope* relied in large part on an Iowa Supreme Court decision, *Pirkl v. Northwestern Mutual Insurance Association*, 348 N.W.2d 633 (Iowa 1984), however, which the Iowa Supreme Court has since interpreted to apply to punitive damages only. *See Hoekstra v. Farm Bureau Mutual Insurance Co.*, 382 N.W.2d 100, 111 (Iowa 1986).

future years are not proper measures of damage in this case.

Shehata's failure to pay the remaining amount due on the invoice, however, directly relates to the $35,000 claim the insurers refused to pay as promised and is foreseeable damage suffered in addition to the $35,000 loss. There is evidence Aossey reasonably relied on the insurers' statements regarding coverage in his relationships with Shehata, and Aossey testified that had the insurer paid the $35,000 as promised, he was confident the remaining balance would have been paid by Shehata promptly. The evidence further suggests that Midamar, as an American company, did not realistically have the option of recovering contract damages from Shehata in a Saudi court. Under these admittedly unique circumstances, we find the jury's award of $55,810.60 properly measures the damage plaintiff suffered in addition to the $35,000 awarded by the district court. *See Universal Computer*, 628 F.2d at 825–26.

## III.

For all of the foregoing reasons, we affirm the judgment of the district court, with the exception of the issue of damages. Because we find plaintiff entitled to the $55,810.60 found by the jury as the damage sustained from Shehata's failure to pay until the insurance claim was settled, the judgment of the district court granting defendants' motion for judgment notwithstanding the verdict on the $55,810.60 award is reversed. In all other respects, the court's judgment is affirmed.